T.C. Memo. 2008-117

UNITED STATES TAX COURT

WILLIAM G. SCHWARTZ AND JACQUELINE R. SCHWARTZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12530-06L.          Filed April 28, 2008.

<u>Gregory M. McCauley</u>, for petitioners.

<u>Kathleen K. Raup</u>, for respondent.

MEMORANDUM OPINION

JACOBS, <u>Judge</u>:[1] The petition in this case was filed in
response to a Notice of Determination Concerning Collection
Action(s) Under Section 6320 and/or 6330 (notice of

_____

[1]This case was submitted to Judge James S. Halpern on Nov.
26, 2007.  The Chief Judge reassigned this case to Judge Julian
I. Jacobs on Mar. 14, 2008.

determination).[2]  The issue for decision is whether respondent abused his discretion in rejecting as inadequate petitioners' offer-in-compromise to satisfy their unpaid income taxes for tax years 1996, 1997, 1998, 2000, and 2001.

## Background

This case was submitted fully stipulated pursuant to Rule 122.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Petitioners resided in Pennsylvania at the time they filed their petition.

Petitioners filed income tax returns for the years at issue as follows:

| Year | Date Return Due (After Extensions) | Date Return Filed | Adjusted Gross Income per Return | Income Tax per Return | Self Employment Tax per Return |
| --- | --- | --- | --- | --- | --- |
| 1996 | Oct. 15, 1997 | Jan. 7, 1999 | N/A | $136,155 | N/A |
| 1997 | Oct. 15, 1998 | Aug. 6, 1999 | $185,713 | 63,354 | $ 5,610 |
| 1998 | Oct. 15, 1999 | Oct. 28, 1999 | 117,963 | 32,906 | 11,831 |
| 2000 | Aug. 15, 2001 | Aug. 7, 2001 | 55,953 | 15,193 | 12,124 |
| 2001 | Oct. 15, 2002 | Oct. 17, 2002 | 104,836 | 26,569 | 13,525 |

Respondent assessed the tax shown on each return.  As of November 10, 2003, the date respondent issued a Letter 1058, Final Notice of Intent to Levy and Notice of Your Right to a Hearing (final notice of intent to levy), for tax years 1996 through 2001, the unpaid balance of petitioners' tax liabilities (after taking into

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

account withholding credits, payments, additions to tax, and interest) totaled $287,523.10.[3]

The final notice of intent to levy was followed on November 17, 2003, by a Notice of Federal Tax Lien with respect to petitioners' outstanding tax liabilities for 1996 through 2001 and a Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 (notice of tax lien filing), for tax years 1996 through 2001. In response to respondent's final notice of intent to levy and notice of tax lien filing, petitioners, in December of 2003, requested hearings under sections 6320 and 6330. Petitioners' hearing under section 6320 was held in conjunction with their hearing under section 6330 and was conducted by correspondence and telephone conversations with a succession of four officers in respondent's Office of Appeals.

At their hearing petitioners sought to compromise their tax liability. In the course of exploring this collection alternative, the parties disagreed as to the amount of petitioners' reasonable collection potential, which in turn largely depends upon the net amount petitioners could realize

---

[3]This amount includes $4,629.93 owed for tax year 1999. Petitioners paid some of the taxes due after respondent issued the final notice of intent to levy. As a consequence, no tax is owed and respondent does not seek to collect any amount with respect to 1999.

from their equity in their home, their main asset.[4]  This disagreement forms the basis of petitioners' claim that respondent placed a value on petitioners' home greater than that which could be realized and thus abused his discretion in rejecting petitioners' offer-in-compromise.

The Internal Revenue Service (IRS) refused to process petitioners' first ($29,124) offer-in-compromise, claiming that as of the date of the offer-in-compromise (June 2004) petitioners were not current with regard to tax deposits for their business employees.  After clarifying that they did not have business employees for the period in question, in September 2004 petitioners resubmitted their $29,124 offer-in-compromise, which was accepted for processing.  Before respondent took action on that offer-in-compromise other than to request additional information, petitioners submitted an amended offer-in-compromise for $7,452 on November 17, 2004, followed by a second amended offer-in-compromise for $65,525 on November 26, 2004.  Respondent accepted petitioners' $65,525 offer-in-compromise for processing.

---

[4]As discussed infra, the reasonable collection potential with respect to the tax debt of a taxpayer is defined as the amount that can be collected from all available means and is generally calculated using:  (1) The values of assets, (2) future income, (3) amounts collectible from third parties, and (4) assets and/or income that are available to the taxpayer but beyond the reach of the Government (e.g., assets to which a lien will not attach because they are outside the country).  1 Administration, Internal Revenue Manual (CCH), pt. 5.8.4.4.1, at 16,307.

In support of their $65,525 offer-in-compromise, petitioners submitted a written appraisal for their home, dated March 10, 2003, which represented that the home had a "quick sale", "as is" value of $400,000.

In evaluating the $65,525 offer-in-compromise, respondent's Appeals officer requested an opinion as to the offer's legal sufficiency from respondent's Office of Chief Counsel. In March 2005 respondent's Office of Chief Counsel responded that the $65,525 offer-in-compromise was legally insufficient because, among other things, (1) the appraisal of petitioners' home was by then more than 2 years old, and (2) because the appraisal was based on comparable sales made on or before the summer of 2002, the appraisal did not accurately reflect the value of the property at the time the $65,525 offer-in-compromise was submitted.

Petitioners claimed that they had little or no equity in their home because it was encumbered by two mortgages, one of which was held by a savings bank in the approximate amount of $280,000. Respondent's Office of Chief Counsel did not contest the bona fides of that mortgage but did question the bona fides of a $125,000 "open end mortgage" held by William G. Schwartz's father which was recorded shortly before the filing of respondent's notice of tax lien.

Upon receiving the response from respondent's Office of Chief Counsel, respondent's Appeals officer requested additional information from petitioners, including a new appraisal of their home. Accordingly, on August 3, 2005, petitioners provided an appraisal as of November 1, 2004, which was prepared by the same appraiser who had prepared the first appraisal. It showed an "as is" value for the home of $400,000. On October 11, 2005, petitioners submitted yet another appraisal as of October 5, 2005. That appraisal was prepared by a different appraiser and showed an "as is" value of $430,000. On October 21, 2005, petitioners provided respondent's Appeals officer with an inspection report, dated July 19, 2005.

Respondent's Appeals officer independently investigated the value of petitioners' home and identified a number of problems with petitioners' appraisals. For example, the Appeals officer discovered that three smaller properties in the same area were for sale for $500,000 to $650,000, but were not reflected in petitioners' appraisals. Additionally, a November 2004 sale of a smaller property in the same area for $780,000 was omitted. Furthermore, it appeared that property values in the area had increased by more than 70 percent in recent years, whereas petitioners' most recent appraisal reflected a much smaller increase, even though it appeared that petitioners had made major

improvements on their property.  The Appeals officer's report
detailed the weaknesses of petitioners' appraisals.[5]

On November 3, 2005, respondent's Appeals officer advised
petitioners that she could recommend acceptance of an amended
offer-in-compromise for $129,361.  The Appeals officer wrote:
"Once you have returned the amended Offer form, I will forward
the case to our Chief Counsel office for concurrence."
Petitioners duly signed and submitted an amended offer-in-
compromise.[6]  Thereafter, the Appeals officer requested an
opinion from respondent's Office of Chief Counsel as to the legal
sufficiency of petitioners' $129,361 offer.

On March 26, 2006, respondent's Office of Chief Counsel
responded to the Appeals officer that it was unable to determine
whether petitioners' $129,361 offer-in-compromise was legally
sufficient because the reasonable collection potential of
petitioners' home had not been adequately determined.  The
Appeals officer was advised to request assistance from

---

[5]The Appeals Officer's report identified other items
requiring adjustment that are no longer at issue.  For example,
the Appeals officer adjusted the amount petitioners claimed as
equity in their pension plans.  In addition, the Appeals officer
disregarded the "open end mortgage" held by William G. Schwartz's
father, but made a $54,000 allowance for amounts from the father
that had been used to pay a portion of petitioners' tax
liabilities.

[6]At that time petitioners' tax liability approximated
$315,930.

respondent's Engineering Group.[7]  The Appeals officer then
forwarded all three of petitioners' appraisals to respondent's
Engineering Group to ascertain whether the valuations were
reasonable.  On May 1, 2006, a member of respondent's Engineering
Group, holding an MAI designation,[8] informed the Appeals officer
by letter that the current market value of petitioners' home
might be 30 to 40 percent greater than that stated in
petitioners' appraisals.  Before reaching this conclusion, the
Engineering Group member had reviewed additional sales in the
subject market area.

Respondent's Office of Appeals rejected petitioners'
$129,361 offer-in-compromise as inadequate and notified
petitioners of this rejection on June 6, 2006.  On the same date,
respondent issued a notice of determination sustaining both the
proposed levy and the filing of a Federal tax lien for the tax
years in issue.

Petitioners timely filed their petition seeking our review
of respondent's determination.  Petitioners contend that:  (1)

---

[7]Respondent's Engineering Group consists of experts who
provide technical advice for field investigations.

[8]MAI is a designation awarded to qualifying members of the
Appraisal Institute (the body that resulted from the merger of
the American Institute of Real Estate Appraisers and the Society
of Real Estate Appraisers).  Within the real estate appraisal
community MAI is viewed as the highest regarded appraisal
designation.  See Estate of Auker v. Commissioner, T.C. Memo.
1998-185.

Respondent rejected their $65,525 and $129,351 offers-in-compromise "out of hand, without basis or reason" and (2) because petitioners submitted a certified appraisal supporting their valuation, respondent's Engineering Group likewise should have prepared a certified appraisal supporting its conclusions. Petitioners further claim that respondent should have continued to negotiate an acceptable offer-in-compromise, and respondent's failure to do so constituted an abuse of discretion.

## Discussion

Section 6321 imposes a lien in favor of the United States on all property and property rights of a person who is liable for, and fails to pay, taxes after demand for payment has been made. The lien arises when assessment is made and continues until the assessed liability is paid or becomes unenforceable by lapse of time. Sec. 6322. For the lien to be valid against certain third parties, the Secretary must file a notice of Federal tax lien, and within 5 business days thereafter the Secretary must provide written notice to the taxpayer. Secs. 6320(a), 6323(a). The taxpayer may then request an administrative hearing before an Appeals officer. Sec. 6320(b)(1).

Section 6331(a) authorizes the Secretary to levy upon property and property rights of a taxpayer liable for taxes who fails to pay those taxes within 10 days after notice and demand

for payment.  Section 6331(d) provides that the levy authorized in section 6331(a) may be made with respect to any unpaid tax only after the Secretary has notified the person in writing of his intention to make the levy at least 30 days before any levy action is begun.  Section 6330 elaborates on section 6331 and provides that upon a timely request a taxpayer is entitled to a collection hearing before respondent's Office of Appeals.  Sec. 6330(a)(3)(B) and (b)(1).  A request for a collection hearing must be made within the 30-day period commencing on the day after the date of the section 6330 notice.  Sec. 6330(a)(3)(B),(2); sec. 301.6330-1(b)(1), Proced. & Admin. Regs.

If a hearing under section 6320 or 6330 is requested, the hearing is to be conducted by respondent's Office of Appeals, and, at the hearing, the Appeals officer conducting it must verify that the requirements of any applicable law or administrative procedure have been met.  Secs. 6320(b)(1), (c), 6330(b)(1),(c)(1).  To the extent practicable, a hearing under section 6320 is to be held in conjunction with a hearing under section 6330, and the conduct of the hearing is to be in accordance with the relevant provisions of section 6330.  Sec. 6320(b)(4),(c).  The taxpayer may raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy. Secs. 6320(c), 6330(c)(2)(A).

At the conclusion of the hearing, the Appeals officer must determine whether and how to proceed with collection and take into account: (i) The relevant issues raised by the taxpayer, (ii) challenges to the underlying tax liability by the taxpayer, where permitted, and (iii) whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayer that the collection action be no more intrusive than necessary. Secs. 6320(c), 6330(c)(3).

Section 7122(a) permits the Secretary to compromise any civil case arising under the internal revenue laws. Section 7122(c) requires the Secretary to prescribe guidelines for officers and employees of the IRS to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute. Sec. 7122(a),(c)(1). Section 7122(b) provides that if the Secretary makes a compromise exceeding $50,000, an opinion of the General Counsel for the Department of the Treasury or his delegate shall be placed on file in the office of the Secretary. Sec. 301.7122-1(e)(6), Proced. & Admin. Regs.

The contemplated guidelines and schedules pertaining to evaluating offers-in-compromise on the basis of collectibility have been published in the regulations interpreting section 7122. See sec. 301.7122-1(c)(2), Proced. & Admin. Regs.; 1 Administration, Internal Revenue Manual (CCH), pt. 5.8.4.4, at 16,306. Under this administrative guidance, the Secretary will

generally compromise a liability on the basis of doubt as to collectibility only if the liability exceeds the taxpayer's reasonable collection potential.  Cf. Murphy v. Commissioner, 125 T.C. 301, 308-310 (2005), affd. 469 F.3d 27 (1st Cir. 2006). Furthermore, an offer to compromise based on doubt as to collectibility will be acceptable only if the offer reflects the taxpayer's reasonable collection potential; i.e., that amount, less than the full liability, that the IRS could collect through means such as administrative and judicial collection remedies. Id. at 309; Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517.  The Secretary has no duty to negotiate with a taxpayer before rejecting the taxpayer's offer-in-compromise.  Fargo v. Commissioner, 447 F.3d 706, 713 (9th Cir. 2006), affg. T.C. Memo. 2004-13; Catlow v. Commissioner, T.C. Memo. 2007-47.

A taxpayer's reasonable collection potential is determined, in part, using the published guidelines for certain national and local allowances for basic living expenses and essentially treating income and assets in excess of those needed for basic living expenses as available to satisfy Federal income tax liabilities.  See 2 Administration, Internal Revenue Manual (CCH), exh. 5.15.1-3, at 17,668, exh. 5.15.1-8, at 17,686, exh. 5.15.1-9, at 17,742.

The aforementioned formulaic approach is disregarded, however, upon a showing by the taxpayer of special circumstances

that may cause an offer to be accepted notwithstanding that it is for less than the taxpayer's reasonable collection potential, e.g., the taxpayer is incapable of earning a living because of a long-term illness, and it is reasonably foreseeable that the taxpayer's financial resources will be exhausted providing for care and support during the course of the condition.  Sec. 301.7122-1(b)(3), (c)(3), Proced. & Admin. Regs.; 1 Administration, Internal Revenue Manual (CCH), pt. 5.8.11.2.1, at 16,375, sec. 5.8.11.2.2, at 16,377.  Petitioners do not allege, and it does not appear, that any such special circumstances are present.

Where, as here, the underlying tax liability is not at issue, we review respondent's determination for abuse of discretion.[9]  Sego v. Commissioner, 114 T.C. 604, 610 (2000). This standard does not require us to decide what we think would be an acceptable offer-in-compromise.  Murphy v. Commissioner, supra at 320.  Rather, our review is to determine whether respondent's rejection of petitioners' offer-in-compromise was

---

[9]Secs. 301.6320-1(f)(2), A-F5, and 301.6330-1(f)(2), A-F5, Proced. & Admin Regs., provide that in seeking Tax Court review of a notice of determination, the taxpayer can ask the Court to consider only an issue that was raised in the taxpayer's sec. 6320 and/or 6330 hearing.  See Giamelli v. Commissioner, 129 T.C. 107, 113 (2007); Magana v. Commissioner, 118 T.C. 488, 493 (2002).  Petitioners raised various issues pertaining to their underlying tax liabilities in their requests for a hearing under secs. 6320 and 6330 but did not pursue those claims at the hearing, or at any time thereafter.

arbitrary, capricious, or without sound basis in fact or law.
Id.

Petitioners do not suggest, and it does not appear from this record, that respondent failed to follow his own procedures in evaluating petitioners' offers-in-compromise or that those procedures were defective. Petitioners claim that respondent summarily refused to accept the values shown in the appraisals they submitted and consequently miscalculated their reasonable collection potential. That miscalculation, according to petitioners, led respondent to reject both their $65,525 offer-in-compromise, evaluated by respondent's Office of Chief Counsel in March of 2005, and their $129,361 offer-in-compromise, evaluated by respondent's Engineering Group in May of 2006, and constituted an abuse of discretion.

Respondent's Office of Chief Counsel identified a number of defects in petitioners' $65,525 offer-in-compromise, such as the outdated appraisals submitted in support of the claimed value of petitioners' home, the validity of an encumbrance placed on the mortgage by a member of petitioners' family, and the consequent value of petitioners' equity in the home. The Appeals officer also identified several problems with the more recent appraisals that petitioners then submitted.

Admittedly, the reviewing member of respondent's Engineering Group expressed her opinion concerning the value of petitioners'

home in a letter to the Appeals officer, as opposed to a formal appraisal report. However, we do not believe that such an appraisal report was required.

The Engineering Group member reviewing petitioners' appraisals held an MAI designation. Her letter to the Appeals officer makes clear that she reached her conclusion after reviewing petitioners' appraisals[10] and by conducting her own investigation with respect to other property sales in the subject market area.

The record shows that from the time petitioners submitted their first offer-in-compromise, a substantial divergence of opinion existed as to the value of petitioners' home. Respondent alerted petitioners to the fact that their appraisals were problematic, beginning with the first appraisal dated March 10, 2003. The bases of respondent's objections to the appraisals were explained.

Upon a review of the record, we cannot say that respondent's objections to petitioners' appraisals were arbitrary, capricious, unreasonable, or without sound basis in fact or law. Nor can we agree with petitioners that respondent's Engineering Group and/or Office of Appeals summarily rejected "out of hand" petitioners'

_____

[10]It is not clear from this record whether petitioners' appraisers held MAI designations. An MAI designation does not appear after their names on their appraisals, although petitioners refer to their "certified MIA appraisals" on brief.

valuation. Moreover, contrary to petitioners' assertion, respondent was under no obligation "to negotiate a new offer-in-compromise figure" once respondent determined that petitioners' $129,361 offer-in-compromise was inadequate.

We hold that respondent did not abuse his discretion in rejecting petitioners' offer-in-compromise as inadequate. Consequently, we sustain respondent's determination that the proposed levy and filing of a Federal tax lien were appropriate.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.