T.C. Memo. 2012-265

UNITED STATES TAX COURT

THOMAS W. BROMBACH, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7924-07L.                    Filed September 12, 2012.

Thomas W. Brombach, pro se.

<u>Anne D. Melzer</u> and <u>Jane J. Kim</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  Thomas Brombach owed nearly $152,000 in unpaid taxes

for 1988-92.  The Commissioner warned Brombach that he had put a lien on

Brombach's property.  Brombach offered $28,000 to settle the debt--but the

[*2] Commissioner rejected the offer and declined to lift the lien because he thought Brombach could pay $113,000 instead. Brombach appeals.

Background

Brombach is an electric-utility consultant who ran into tax troubles during his first marriage more than 15 years ago. In 1998, he settled a case in our Court by agreeing to deficiencies for tax years 1988-92 totaling more than $60,000. Brombach v. Commissioner, T.C. Dkt. No. 14324-95 (May 27, 1998) (stipulated decision). The Commissioner then assessed these liabilities plus interest.

Many years passed without Brombach's paying, and the Commissioner decided in 2005 to file a lien against Brombach's property to secure a debt now grown to more than $150,000, and sent him the required notice. Brombach responded by asking for a collection due process (CDP) hearing under section 6320.[1] In the request, he challenged the amount of tax the Commissioner said he owed and asked for reassurance that the lien would not be applied against his wife's interest in their joint property.[2]

---

[1] Unless otherwise noted all section references are to the Internal Revenue Code in effect at all relevant times. Unless otherwise noted all references to the Internal Revenue Manual (IRM) are to the IRM in effect in March 2007 at the time the Commissioner rejected Brombach's offer.

[2] Brombach also asked the Commissioner to abate interest and penalties for

(continued...)

**[*3]**  His wife then got more involved and gathered the information Brombach

needed to give to the Appeals officer.[3]  Brombach quickly learned that he could not

contest his liabilities for 1988-92, having already had his chance to do so in Tax

Court.  He chose instead to try to compromise the tax debt.  With his wife's help, he

completed a Form 433-A, Collection Information Statement for Wage Earners and

Self-Employed Individuals, and presented the Appeals officer with a packet of

substantiating documents.  Brombach's CDP hearing went smoothly, with both

sides focusing on how much Brombach could pay.

A few weeks after the hearing, Brombach submitted a completed offer of

$28,000.  He included with the offer a letter explaining why his monthly expenses

exceeded the national standards the IRS usually uses.  He also listed several

"special circumstances"--medical conditions affecting his future earning potential,

and concerns about a lack of retirement income if he withdrew money from his

401(k).  (Brombach was 55 at the time.)

---

[2](...continued)
his 1997 and 1998 tax liabilities.  The parties settled this issue before trial.

[3] In 1999 Brombach had the good fortune of marrying Lynn Calder.  She had
taken some accounting courses and had informally helped prepare "easy" tax returns
for about 35 years.  Brombach's new bride helped a great deal in organizing the
records and making good arguments for her husband.  Though she is neither a
lawyer nor admitted to practice, we gave her some leeway to help Brombach
present his case.

**[*4]**   The Appeals officer ultimately rejected the offer, because he concluded that Brombach could pay more than $113,000.  He also wrote that he found "no special circumstances that would make your offer acceptable."

Brombach, a resident of western New York then and now, filed a petition claiming that the rejection of his offer was an abuse of discretion.  We tried the case in Buffalo.

Discussion

When someone fails to pay his taxes after the IRS demands he do so, his tax liability becomes a lien in favor of the United States against all his property.  Sec. 6321.  Filing a notice of that lien is important because it gives the government's lien priority against those of competing creditors who file later.  See sec. 6323(a); Behling v. Commissioner, 118 T.C. 572, 575 (2002).  It also opens a short window of time during which a taxpayer may demand a CDP hearing to check whether the Commissioner properly filed the lien, and to take a second look at whether that filing should be sustained.  A CDP hearing is also a taxpayer's chance to offer collection alternatives.

During his CDP hearing, Brombach offered to compromise his tax debt as a collection alternative.  The Code permits this, and section 7122 gives the Commissioner very wide discretion to compromise tax liabilities and to lay down

**[*5]** guidelines to "determine whether an offer-in-compromise is adequate and should be accepted." Sec. 7122(a), (c)(1).

The Commissioner has delegated decisions on whether to accept offers-in-compromise to IRS employees, who are supposed to follow regulations and policies. The aim is a kind of bureaucratic justice--treating all taxpayers according to published standards of general applicability but with a bit of discretion to the individual IRS employee handling a particular case to tinker at the edges if he finds special circumstances. See sec. 301.7122-1(f)(3), Proced. & Admin. Regs.

These regulations and policies tell IRS employees to look at different factors for each of three different kinds of offers. These are offers based on doubt as to liability, offers based on doubt as to collectibility, and a catchall third category of offers to promote effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs. Brombach's offer was based on doubt as to collectibility. The IRS analyzes this kind of offer by calculating how much it thinks a taxpayer can pay or, in IRS jargon, his RCP--reasonable collection potential. Calculating the RCP is complicated, but the goal is easy to understand--it's the IRS's estimate of what it might get from seizing and selling a taxpayer's property and garnishing his income. See Internal Revenue Manual (IRM) pt. 5.8.4.4.1 (Sept. 1, 2005). After piecing together the necessary calculations, the Commissioner rejected

**[\*6]** Brombach's offer because he concluded that it did not come close to the RCP. The Commissioner also concluded that Brombach failed to show the existence of special circumstances which might have justified accepting an amount less than the RCP.

The first issue in this case is whether the Appeals officer was mistaken in concluding that Brombach's RCP was so much more than his offer. Brombach challenges many of the Appeals officer's conclusions about the components of the RCP, his refusal to adjust the RCP for what Brombach calls "special circumstances," and the effect that enforcing the federal tax lien might have on

**[\*7]** Mrs. Brombach.[4]  He also argues that he should have been given an opportunity to negotiate or amend his offer before the Appeals officer rejected it.

Because Brombach isn't challenging his underlying tax liabilities, we review the Commissioner's determination for abuse of discretion.  See Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 182 (2000).  This means that we look to see if the Commissioner's decision was grounded on an error of law or rested on a clearly erroneous finding of fact, or

---

[4] Brombach repeatedly raised concerns about how a lien would affect his wife, whom he describes as an "innocent spouse" and an "injured spouse."  He argues in his brief that the Appeals officer "did not consider his wife's position" before issuing a notice of determination.  Brombach specifically worried that she would be left with no retirement income if he depleted his 401(k) account, and that she would be harmed if the Commissioner put a lien on their jointly owned house. Neither we nor the Commissioner are unsympathetic to her cause.  The Appeals officer credibly testified that he thought Brombach was concerned that the Commissioner would confuse Lynn's name with that of his previous wife, Linda. The Appeals officer's notes show that he verified the name of Brombach's first wife and verified that the liabilities at issue were Brombach's individual liabilities, thus satisfying him that Lynn's property interests would not be harmed by a lien.

We also want to assure Brombach that, should he choose to sell (or should the Commissioner force him to sell) jointly owned property encumbered with a federal tax lien, his wife would get the proceeds representing her interest regardless of what went to pay his tax bill, unless she owed back taxes herself.  See United States v. Rodgers, 461 U.S. 677, 690-91 (1983) ("[T]he Government's lien under § 6321 cannot extend beyond the property interests held by the delinquent taxpayer"). (We also note that Brombach requested an allocation of his 2005 federal income tax refund, which would protect his wife's share from the lien.)

[*8] whether he ruled irrationally. See Indus. Investors v. Commissioner, T.C. Memo. 2007-93, 2007 WL 1219686, at *3 (citing United States v. Sherburne, 249 F.3d 1121, 1125-26 (9th Cir. 2001)); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402-03 (1990). Under this standard we do not decide whether in our own opinion Brombach's offer-in-compromise should have been accepted, but whether the Commissioner exercised his "discretion arbitrarily, capriciously, or without sound basis in fact or law." Woodral v. Commissioner, 112 T.C. 19, 23 (1999); accord Keller v. Commissioner, T.C. Memo. 2006-166, 2006 WL 2346456, at *4, aff'd, 568 F.3d 710 (9th Cir. 2009) (and aff'g and vacating decisions in related cases); Fowler v. Commissioner, T.C. Memo. 2004-163, 2004 WL 1559188, at *4.

I.    Calculating Brombach's RCP

The Commissioner concedes that the Appeals officer made some mistakes in calculating the RCP. And the Brombachs admit that they lowballed their offer a bit, expecting that the Appeals officer would disallow some expenses. The Appeals officer thought that the lowball was in the dirt: He figured that their offer was more than $85,000 short.

With the parties this far apart, our first chore is to decide whether Brombach's arguments scratch away enough of the difference to make the Appeals

[*9] officer's decision to deny the offer an abuse of discretion. The difference between the offer and the RCP rests in a few key calculations:

| Item | Brombach's value | Appeals officer's value |
|---|---|---|
| HD Heritage motorcycle | $1,000 | $4,000 |
| Road King motorcycle | (2,600) | 3,913 |
| 401(k) | 28,000 | 56,065 |
| Bank account | not included | 389 |
| (Monthly income - expenses) x 37 | (358) <br> x   37 <br> 0 | 1321 <br> x      37 <br> 48,877 |
| Total offer/RCP | 28,000 | 113,244 |

A.   Assets

   1.   The Motorcycles

The first dispute is about how Brombach's two motorcycles should figure in calculating his RCP. Brombach told the IRS that he and his wife jointly owned both of them, and the record shows that the Appeals officer took this joint ownership into consideration.[5] The Appeals officer also used Brombach's own valuations to determine the quick-sale value (i.e., 80% of fair market value) of

---

[5] Brombach didn't provide any documentation that Lynn had any interest in the bikes. But the Appeals officer processed the offer as though the bikes were jointly owned, and we will do the same.

[*10] each bike. Using quick-sale value is a reasonable way to account for the possibility that a patient seller would get a higher price than a seller looking to make a speedy sale. See IRM pt. 5.8.5.3.1 (Sept. 1, 2005). But that's where the similarities between the calculations ended: Brombach calculated his interest in each bike by using a "minimum bid" valuation, less any loan balance, less Lynn's share--which he calculated at half the original value (not the "minimum-bid" value) of each bike less any loan balance. The Appeals officer, on the other hand, subtracted the loan balance from the quick-sale value, then divided the result in half to find the value of Brombach's interest. For the Heritage motorcycle, which had no outstanding loans on it, the numbers ran like this:

| Item | Brombach | Appeals officer |
| --- | --- | --- |
| Fair market value | $10,000 | $10,000 |
| Quick sale/min. bid | 6,000 | 8,000 |
| Lynn's share | (10,000 - 10,000/ 2) = 5,000 | 8,000/2 = 4,000 |
| Brombach's share | (Min. bid - Lynn's share) = 1,000 | 8,000/2 = 4,000 |

The Road King was more complicated, because Brombach had financed its purchase and the parties didn't agree at first on when we should look at the loan balance--Brombach said we should take the loan balance at the time of the offer,

[*11] but the Appeals officer reduced the loan amount by expected monthly payments when he calculated the RCP almost a year after Brombach submitted his offer.[6] Both Brombach and the Commissioner made some concessions in their briefs, and now agree that the Appeals officer should have used a loan balance of $5,110.

For the Road King, the numbers, after concessions, look like this:

| Item | Brombach | Appeals officer |
| --- | --- | --- |
| Fair market value | $14,000 | $14,000 |
| Quick sale/min. bid | 8,400 | 11,200 |
| Loan balance | 5,110 | 5,110 |
| Lynn's share | (14,000 - 5,110)/2 = 4,445 | (11,200 - 5,110)/2 = 3,045 |
| Brombach's share | (Min. bid - loan balance - Lynn's interest) = (1,155) | (11,200 - 5,110)/2 = 3,045 |

---

[6] The Appeals officer recalculated the loan balance in February 2007 based on a bill the Brombachs submitted with their March 2006 offer. He did not request updated information from the Brombachs. See, e.g., IRM pt. 5.8.5.2.2(1) (Sept. 1, 2005) ("Collection Information Statements (CIS) submitted with an offer in compromise should reflect information no older than the prior six months. * * * However, in certain situations information may become outdated due to significant processing delays caused by the Service * * * [i]n those cases, it may be appropriate to rely on the outdated information if there is no indication the taxpayer's overall situation has significantly changed.").

[*12] We don't find at all reasonable Brombach's assertion that the value of a taxpayer's "half interest" in a jointly owned asset is anything other than one-half of its realizable value--certainly not when, as here, the taxpayer provides no evidence justifying a different value for an equal share. See, e.g., IRM pt. 5.15.1.17 (May 1, 2004). Brombach did not provide any documentation to show that his interests in the motorcycles should be smaller than his wife's. We also think it is completely unreasonable for Brombach to have computed a value of -$1,155 for the Road King. (He also seems to have used this negative value to offset his share of the equity in the Heritage motorcycle, rendering them together as worth zero in his computation of his RCP.)

We therefore find that the Appeals officer did not err in concluding that Brombach's interests in the two bikes were worth more than Brombach calculated.[7]

### 2. The 401(k) Account

As for the 401(k), the Commissioner conceded that the Appeals officer was wrong to include the account's entire $56,065 balance in the RCP, if for no other reason than that a withdrawal would trigger income and excise taxes. The

---

[7] Because we ultimately find that Brombach's RCP remains higher than his offer, we do not delve into the problems of the difference between the quick-sale value and the minimum-bid valuation.

**[\*13]** Commissioner, however, wants us to recalculate the RCP using its after-tax early-withdrawal value, which would be $33,639. Brombach offered instead to borrow against it, which would yield $28,000. Without ruling on the reasonableness of the Commissioner's approach, we will also assume that the most the Commissioner could get from Brombach's 401(k) was $28,000.

### 3. The Bank Account

The Appeals officer also included in Brombach's RCP his half interest in a bank account, worth $389. Brombach doesn't dispute this addition to his RCP.

### B. Income

The motorcycle and bank account issues are small compared to the single biggest discrepancy between Brombach's and the Appeals officer's calculations-- Brombach's excess monthly income. Brombach's offer indicated that he actually spent more each month than he earned (i.e., that excess income was zero), while the Appeals officer found that Brombach had $1,321 each month in additional income that could go to pay down his tax debt. They agree that Brombach had $8,671 in gross monthly income, but they fight over expenses.

The expense calculations played out like this:

| [*14] Category | Brombach | Appeals officer | Difference |
|---|---|---|---|
| Food, clothing, etc | $1,390 | $1,390 | -0- |
| Housing/utilities | 1,820 | 1,557 | $263 |
| Transportation | 1,439 | 1,172 | 267 |
| Health care | 720 | 720 | -0- |
| Taxes | 2,224 | 1,290 | 934 |
| Life insurance | 151 | 151 | -0- |
| Other secured debt | 754 | -0- | 754 |
| Other expenses | 531 | 1,070 | (539) |
| Total | 9,029 | 7,350 | 1,679 |

We survey each area of difference.

1.   Expenses

a.   Housing Expenses

Section 7122(c)(2) requires the Secretary to set up a schedule of "national and local allowances" to ensure that taxpayers "have an adequate means to provide for basic living expenses" and to standardize the IRS's treatment of taxpayers trying to negotiate a compromise. The Appeals officer disallowed as housing expenses what the Brombachs incurred on rental property they owned, though the amount he allowed was still higher than the local housing standards for Oswego County, where the Brombachs live. The Brombachs argue that the rental expenses

[*15] they included in the offer documents were not for their primary residence, and were above and beyond the expenses for the house. The documents are unclear--the Brombachs claimed substantial home-office expenses in their prior year's tax return, and they also filed a Schedule E, Supplemental Income and Loss, for a rental apartment with the same address as their home. The Brombachs seem to think that the Appeals officer denied expenses related to the rental apartment, which they say is on the same land but is not a part of their house. The Appeals officer, in his trial testimony, said he reduced the housing expenses because they reflected home-office expense deductions, and the Brombachs did not offer a counterargument. We believe the Appeals officer's description of what he did, and agree with him that he did not err in disallowing expenses related to the Brombachs' business use of their home in calculating their housing expense.

We have also repeatedly held that an Appeals officer does not abuse his discretion by using local housing allowances lower than a taxpayer's actual housing expenses if the taxpayer has not shown that he will be harmed by having to live on the lesser amount. Gregg v. Commissioner, T.C. Memo. 2009-19, 2009 WL 211413, at *8; McDonough v. Commissioner, T.C. Memo. 2006-234, 2006 WL 3096036, at *7. The Appeals officer in this case allowed housing expenses

**[\*16]** higher than the local allowance, though $300 less than Brombach had claimed.[8] This was not a clear error, and so no abuse of discretion occurred.

### b.    Transportation Expenses

The second area of difference is transportation expenses, another category for which the IRS has standard local allowances. The Appeals officer lowered this amount because he found that some of it was deducted on the Brombachs' Schedule C as a business expense for 2005. The Appeals officer also said that he increased the amount of the "other expenses" category to include certain business expenses, which may well include the missing transportation allowance. Brombach disputed the reduction in his petition, but didn't follow through with arguments on brief or at trial, so we find that Brombach has conceded the reduction.

---

[8] The IRM in effect during Brombach's CDP hearing lists the housing standard in Oswego County as $1,135 for a family of three, IRM ex. 5.15.1-8 (Jan. 1, 2005), but the Appeals officer allowed $1,557. Though the IRS may have increased the standard from the time the IRM was issued to the time of Brombach's offer, the parties agree that the Appeals officer allowed more than the standard amount. The current standard is $1,483--still lower than the amount allowed for Brombach's RCP. See New York - Local Standards:  Housing and Utilities, http://www.irs.gov/businesses/small/article/0,,id=104830,00.html (last visited August 2, 2012).

**[*17]**                               c.        Monthly Tax Expenses

Brombach's dispute with the Appeals officer about how to estimate his monthly tax expense is much hotter.  Brombach estimated that he would owe $2,224 monthly.  He calculated this by taking 10% of his $8,671 gross monthly wages, $867, as his federal income-tax expense, and 7.65%, $663, for employment taxes. He then added 8%, $694, as his monthly state-tax expense.  The Appeals officer, on the other hand, looked at the pay stub that Brombach submitted and saw that it showed $777.87 in combined federal, state, and payroll taxes for a two-week pay period.  The Appeals officer multiplied this by 2.15, his approximation of the number of pay periods in a month, and then multiplied the result by 12 to give him $20,069, a forecast of the total yearly tax Brombach would pay.  But he wasn't done--the Appeals officer knew that the Brombachs had gotten a refund of $4,591 the previous year, and he subtracted this amount (divided by 12) to get Brombach's average monthly tax expense.

The Brombachs say this is wrong for several reasons.  The first is that they think the Appeals officer should have done his averaging based on the cumulative amount of taxes paid through March 10, 2006--Brombach paid $4,417.53 in taxes

[*18] in his first five pay periods of the year.[9]  They argue that Brombach's work schedule is erratic, with different pay periods having different numbers of hours, different amounts of overtime, and different taxes paid to different states.  They also say the Appeals officer shouldn't have deducted the previous year's refund because it was just unusually large, not evidence that Brombach inflated his tax expense through overwithholding.

We agree with the Brombachs in part.  They submitted credible documentation showing that the March 10 pay stub, which represented income earned in the last two weeks of February, was for a short pay period of only 80 hours, whereas most of the pay periods in the year had 88 or 96 hours.  Brombach didn't base his monthly income estimate on this short pay period (which would have given him only $7,527 in monthly income), and we think he's right that his tax expense shouldn't be based on projecting from this short pay period either.  As Brombach admits, however, basing his monthly tax expense on the cumulative withholding yields $1,900, not the $2,224 he claimed in his offer.

But he loses altogether on the refund issue.  Although he urges us to look at his 2004 and 2006 tax returns, he never introduced them into either the

_____

[9] Although documents submitted with the offer seem to show that these taxes were paid in four pay periods, Brombach says on brief that it was five.

[*19] administrative or the trial record. We are left with only the 2005 tax return, which shows deductions for a grandchild whom Brombach supported, large amounts of unreimbursed employee expenses, Schedule C losses from three businesses, Schedule E losses from rental real estate, and deductions for the business use of his home. Brombach didn't present any evidence that these expenses had gone away-- in fact, his offer included expenses based on national and local standards for a three-person household which would include his grandchild, substantial unreimbursed employee expenses, no income from his businesses, and no net rental income because of sizable costs associated with the rental apartment. The Appeals officer did not clearly err in concluding that the Brombachs would get a similarly large refund in 2005.

Overall, the best Brombach can hope for on his monthly tax expense is $1,900 less his 2005 refund divided by 12. This number is $1,517.

d. "Other Expenses"

Brombach didn't contest the Appeals officer's reduction in his monthly secured debt, or the increase in his "other expenses" category, so we deem those conceded.

[*20]    2.    Recalculated Income and Expenses

Brombach's gross income was $8,671 per month. At the very most, his allowable expenses were as follows:

| Category | Value |
|---|---|
| Food, clothing, etc. | $1,390 |
| Housing/utilities | 1,557 |
| Transportation | 1,172 |
| Health care | 720 |
| Taxes | 1,517 |
| Life insurance | 151 |
| Other secured debt | -0- |
| Other expenses | 1,070 |
| Total | 7,577 |

This leaves $1,094 in extra monthly income for Brombach. The Appeals officer found that there were 37 months remaining under the statute of limitations for collections, and Brombach doesn't disagree, so we multiply the excess monthly income by 37 and find that Brombach's RCP should include at least $40,478 in extra monthly income.

C.    Brombach's Offer Versus RCP

Putting this all together, we find that Brombach's lowest conceivable RCP would look like this:

| [*21] Item | Value |
|---|---|
| Motorcycle equity | $4,645 |
| 401(k) | 28,000 |
| Bank account | 389 |
| Excess income | 40,478 |
| Total | 73,512 |

The Commissioner will generally accept an offer-in-compromise based on doubt as to collectibility only if it equals a taxpayer's RCP. Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517. But even in the light of our recalculation of Brombach's RCP--bending in his favor in every reasonable way--his offer still falls short by more than $45,000. We have consistently held that the Commissioner doesn't abuse his discretion by rejecting an offer-in-compromise that falls short of a taxpayer's RCP. Murphy v. Commissioner, 125 T.C. 301, 320-21 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); Lemann v. Commissioner, T.C. Memo. 2006-37, 2006 WL 549206, at *10; see also McClanahan v. Commissioner, T.C. Memo. 2008-161, 2008 WL 2550665, at *5.

Since Brombach offered less than his RCP, the only thing that could save his offer is if the Appeals officer abused his discretion in failing to consider the special circumstances Brombach raised, or if he failed to meet some procedural requirement of the CDP process.

[*22] II.    Special Circumstances

In some cases, the Commissioner will accept an offer of less than the reasonable collection potential if there are "special circumstances."  Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. at 517.  Special circumstances are:  (1) Circumstances demonstrating that the taxpayer would suffer economic hardship if the IRS were to collect from him an amount equal to the RCP; or (2) circumstances justifying acceptance of an amount less than the RCP based on considerations of public policy or equity.  See Murphy, 125 T.C. at 309 (citing IRM pt. 5.8.4.3(4) (Sept. 1, 2005)).

Brombach first makes a procedural argument.  He contends that the Commissioner should have given reasons in the notice of determination for finding that no special circumstances existed.  He argues that the Commissioner's failure to do so is by itself proof that the Commissioner acted arbitrarily.

But that's not the law.  The Commissioner does not need to list in the notice of determination every single fact that he considered.  See Barnes v. Commissioner, T.C. Memo. 2006-150, 2006 WL 2052884, at *7.  The Commissioner's failure to tell Brombach in detail how he decided that Brombach faced no special circumstances was therefore not an abuse of discretion.  See

**[*23]** <u>Sullivan v. Commissioner</u>, T.C. Memo. 2009-4, 2009 WL 20979, at *14;

<u>Johnson v. Commissioner</u>, T.C. Memo. 2007-29, 2007 WL 415139, at *9.

That doesn't mean the Commissioner can avoid any challenge to his reasoning by hiding it from us and the taxpayer. But it does mean that Brombach still has to persuade us that he faced some special circumstances. Brombach argues first that the Commissioner failed to realize the economic hardship that both he and his wife would endure if required to make a payment equal to his RCP. Section 301.6343-1(b)(4)(i), Proced. & Admin. Regs., finds economic hardship when a taxpayer is "unable to pay his or her reasonable basic living expenses." Section 301.7122-1(c)(3)(iii), Proced. & Admin. Regs., offers examples of economic hardship, including: (1) a taxpayer who provides full-time care to a dependent child with a serious long-term illness and must use equity in his assets to provide for basic living expenses and medical care for his child; (2) a retired taxpayer who, if his only source of income--a retirement account--were liquidated, would be unable to pay his basic living expenses; or (3) a disabled taxpayer with a fixed income, limited earning potential, and a modest home specially equipped to accommodate his disability, the forced sale of which would cause him severe harm. Sec. 301.7122-1(c)(3)(iii), <u>Examples</u> (<u>1</u>), (<u>2</u>), and (<u>3</u>), Proced. & Admin. Regs.

[*24] These examples illustrate the types of economic hardship that the Commissioner should be looking for when considering whether to accept an offer-in-compromise based on doubt as to collectibility with special circumstances. The record here shows that Brombach was living far from such dire circumstances as those described in these examples. He had a home worth $175,000--apparently with a separate rental unit--and he owned two cars and two motorcycles. Economic hardship does not include the maintenance of an affluent standard of living, see sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs., and we don't think Brombach was living in luxury. But living a reasonable middle-class lifestyle is not a special circumstance.

We also think it important that Brombach was not retired when he submitted his offer. He was still earning income, and there's nothing in the record suggesting his wife is unable to work or is not currently working, too. The key question is whether, after collection of an amount equal to his reasonable collection potential, a taxpayer will be left with adequate means to provide for basic living expenses. The record shows that the Brombachs will.

Brombach also claims that the Commissioner failed to adequately consider his age, health, retirement status, medical costs, and the likelihood of future increases in medical costs as applied to both him and his wife. There is, however,

**[*25]** nothing in the record substantiating any such future costs. In <u>Johnson</u>, 2007 WL 415139, at *6, we said that it was not arbitrary or capricious for the Commissioner to ignore speculative future costs in making a final determination. We can't say on the record in this case that the Commissioner abused his discretion in denying Brombach's request for an offer-in-compromise based on doubt as to collectibility with special circumstances. <u>See also</u> <u>Blondheim v. Commissioner</u>, T.C. Memo. 2006-216, 2006 WL 2873061, at *6 (no abuse in disallowing speculative future medical costs); <u>Fargo v. Commissioner</u>, 447 F.3d 706, 710 (9th Cir. 2006) (same), <u>aff'g</u> T.C. Memo. 2004-13.

Even if Brombach had proved economic hardship, the Commissioner's guidelines and procedures still would have recommended that Brombach's request be denied. "The existence of economic hardship criteria does not dictate that an offer must be accepted. * * * When hardship criteria are identified but the taxpayer does not offer an acceptable amount, the offer should not be recommended for acceptance." IRM pt. 5.8.11.2.1(11) (Sept. 1, 2005). Brombach offered $28,000 to compromise his tax debt, but even if we give him every reasonable benefit of the doubt, his RCP still comes out considerably higher than his offer. This Court has held that it can't be an abuse of discretion to reject an offer-in-compromise that bears no relationship to the taxpayer's own calculation of his ability to pay.

[*26] <u>Atchison v. Commissioner</u>, T.C. Memo. 2009-8, 2009 WL 89218, at *3;

<u>Estate of Andrews v. Commissioner</u>, T.C. Memo. 2007-30, 2007 WL 415110, at

*7; <u>Hubbart v. Commissioner</u>, T.C. Memo. 2007-26, 2007 WL 397067, at *8.

Thus, even if Brombach had demonstrated special circumstances, the Commissioner

could still have rejected Brombach's offer-in-compromise without committing an

abuse of discretion.

III.     <u>Duty To Dicker</u>

The Appeals officer credibly testified that "We were so far apart that we

didn't get into * * * the negotiation of one or two particular items [that] would have

brought us together."  Citing this refusal, Brombach makes one final procedural

argument--that the Commissioner failed to give him an opportunity to negotiate or

amend his offer before issuing the notice of determination, and that this was itself an

abuse of discretion.

An Appeals officer cannot simply reject an offer solely on the basis of the

offer's amount without evaluating it under the Secretary's policies and procedures.

<u>See</u> sec. 301.7122-1(f)(3), Proced. & Admin. Regs.  But Brombach doesn't point us

to, and we have not found, any legal authority that imposes a duty on the IRS to

negotiate a collection alternative in any particular way.  He does point to one source

that seems to impose a lesser duty on the Appeals officer--a duty to give the

[*27] taxpayer a chance to match the RCP before outright rejection.  Brombach says

the Commissioner's offer-in-compromise explanation packet states:  "The examiner

may decide that a larger offer amount is necessary to justify acceptance.  You will

have the opportunity to amend your offer."  Form 656-B, Offer in Compromise

Booklet (March 2009), at 15.  This language suggests that if the examiner finds that

a higher offer might be accepted, he'll at least give the taxpayer a chance to take it

or leave it.  This is not what happened in Brombach's case.  He sent in an offer and

received a rejection.  While it's understandably frustrating to Brombach that the

guidelines weren't followed in his case, instructions and other IRS publications are

not authoritative sources of federal tax law.  Casa de La Jolla Park, Inc. v.

Commissioner, 94 T.C. 384, 396 (1990).  Taxpayers must look to authoritative

sources of Federal tax law such as statutes, regulations, and judicial decisions and

not to informal publications provided by the IRS.  Zimmerman v. Commissioner, 71

T.C. 367, 371 (1978), aff'd, 614 F.2d 1294 (2d Cir. 1979).

Though neither the Brombachs nor the Commissioner mentions it, the IRM

contains a similar provision, directing Appeals officers to give taxpayers an

opportunity to match the minimum acceptable amount before rejection.  IRM pt.

5.8.4.6 (Sept. 1, 2005).  This source may seem more authoritative than an IRS

[*28] booklet, but it isn't--the IRM is not a source of rights enforceable by taxpayers. Fargo, 447 F.3d at 713 (citing cases from five other circuits); Vallone v. Commissioner, 88 T.C. 794, 807-08 (1987) ("I.R.M. requirements are necessarily merely directory and not mandatory and noncompliance does not render the action of the * * * [IRS] invalid.") (citing United States v. Horne, 714 F.2d 206, 207 (1st Cir. 1983)).

Brombach hasn't shown that an opportunity to amend his offer is required by the Constitution or by any statute, regulations, or caselaw. The opportunity to amend an offer is not a taxpayer's right but is within the Commissioner's discretion, and the Commissioner has no binding duty to negotiate with a taxpayer before rejecting his offer. See Kreit Mech. Assocs., Inc. v. Commissioner, 137 T.C. 123, 134 (2011); Estate of Mangiardi v. Commissioner, T.C. Memo. 2011-24, 2011 WL 280925, at *6, aff'd, 442 Fed. Appx. 526 (11th Cir. 2011); Schwartz v. Commissioner, T.C. Memo. 2008-117, 2008 WL 1862652, at *4, aff'd, 348 Fed. Appx. 806 (3d Cir. 2009); Catlow v. Commissioner, T.C. Memo. 2007-47, 2007 WL 623782, at *10; see also Fargo, 447 F.3d at 713.[10] We are left to conclude that

---

[10] In Samuel v. Commissioner, T.C. Memo. 2007-312, 2007 WL 2990112, the taxpayer offered $30,000 to settle a multiyear tax debt of over $700,000. The IRS had computed his RCP to be $133,158, but we found mistakes and recomputed the right number to be slightly over $107,000. Id. at *9. And, relying on IRM pt. 5.8.4.6 (Sept. 1, 2005), we held in Samuel that the IRS abused its discretion in not

(continued...)

[*29] the Appeals officer did not err as a matter of law because the IRM and IRS instructions are not law. And we cannot conclude that he ruled irrationally in rejecting an offer that was substantially lower than the RCP. See Johnson v. Commissioner, 136 T.C. 475, 491-92 (2011); Vanmali v. Commissioner, T.C. Memo. 2012-100, 2012 WL 1165493, at *3; Litwak v. Commissioner, T.C. Memo. 2009-292, 2009 WL 4980473, at *5, aff'd, 473 Fed. Appx. 709 (9th Cir. 2012); Atchison, 2009 WL 89218, at *3.

The Appeals officer believed that the IRS and Brombach were too far apart to negotiate successfully. We cannot conclude on the record in this case that his belief was an abuse of discretion.

IV.   Conclusion

Although the Appeals officer definitely made some mistakes in calculating Brombach's RCP, and may have made others, Brombach's offer was still lower

---

[10](...continued)
giving the taxpayer a chance to match the *adjusted* RCP of $107,000. Id. We remanded for the limited purpose of allowing Samuel the chance to do so. Id. It seems that neither party in that case brought to the attention of the Court either the line of cases holding an Appeals officer does not abuse his discretion where the reduced RCP is more than the taxpayer's offer or the numerous cases holding the IRM not to have the force of law. We have since definitively held in Kreit Mechanical, a T.C. opinion, that the Commissioner has no duty to negotiate with a taxpayer before rejecting his offer-in-compromise, and this would seem to have drained Samuel of its vitality.

[*30] than his RCP, so that its rejection was not an abuse of discretion. The Commissioner also did not abuse his discretion in finding that Brombach had not substantiated any special circumstances that might have justified his low offer. Nor did Brombach identify any procedural errors that would amount to an abuse of discretion. We therefore sustain the determination to uphold the lien.

<u>Decision will be entered for</u> <u>respondent</u>.