# United States Tax Court

T.C. Memo. 2026-54

CHARLTON C. TOOKE, III,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 398-21L.                                  Filed June 23, 2026.

———————

*Joseph A. DiRuzzo III* and *Daniel M. Lader*, for petitioner.

*Kimberly A. Daigle*, *Lauren B. Epstein*, *Joshua P. Hershman*, and *Christopher W. Jones*, for respondent.


MEMORANDUM OPINION

JONES, *Judge*: In this collection due process (CDP) case, petitioner, Charlton C. Tooke III, asks this Court to review a Notice of Determination Concerning Collection Actions Under IRC Sections 6320[1] or 6330 of the Internal Revenue Code (Notice of Determination), issued by the Internal Revenue Service (IRS) Independent Office of Appeals (Appeals)[2] on January 5, 2021. The Notice of Determination rejected Mr. Tooke's proposed collection alternatives and sustained the filing of a Notice of Federal Tax Lien (NFTL) for taxable years 2013 through 2017

———

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulatory references are to the *Code of Federal Regulations,* Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] On July 1, 2019, the IRS Office of Appeals was renamed the IRS Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019).

[*2] (lien years) and the proposed levy actions for taxable years 2012 through 2017 (levy years) (collectively, taxable years at issue).

On January 29, 2025, the Court filed an opinion addressing two Motions, and the constitutional arguments raised therein, that were filed by Mr. Tooke. *See Tooke v. Commissioner*, 164 T.C. 16 (2025). By Order the following day, on January 30, 2025, the Court denied Mr. Tooke's Motions. This matter is now before the Court on respondent's Motion to Dismiss on Ground of Mootness with respect to taxable year 2012, as well as petitioner's and respondent's respective cross-Motions for Summary Judgment pursuant to Rule 121.

The issues for decision are whether (1) the Court should dismiss taxable year 2012 on the ground of mootness and (2) Appeals abused its discretion by rejecting Mr. Tooke's proposed collection alternatives, including an offer-in-compromise (OIC) and an installment agreement (IA), and sustaining the filing of the NFTL for the lien years and, subject to our decision on the first question, the proposed levy action for the levy years. For the reasons elaborated upon below, the Court will grant respondent's Motion to Dismiss on Ground of Mootness with respect to taxable year 2012. Further, with respect to the CDP determination, the Court will grant respondent's Motion for Summary Judgment and deny Mr. Tooke's.

*Background*

The following background information is drawn from the parties' pleadings, Motion papers and attached Exhibits, and the Administrative Record of the CDP hearing[3] conducted pursuant to sections 6320 and 6330.[4] *See* Rules 93, 121(c). This background is stated solely for the

---

[3] Mr. Tooke's requests for a section 6320 lien hearing and a section 6330 levy hearing were combined, and one hearing was conducted. *See* Treas. Reg. §§ 301.6320-1(d)(2), Q&A-D2 and D3, 301.6330-1(d)(2), Q&A-D2 and D3. We will refer to the combined hearings as the CDP hearing.

[4] Pursuant to Rule 93(a), the parties stipulated the Administrative Record in this case. However, attached to respondent's Motion for Summary Judgment were Forms 4340, Certificate of Assessments, Payments, and Other Specified Matters, for Mr. Tooke for taxable years 2012 through 2017, which were not directly included in the Administrative Record. Nevertheless, because the Forms 4340 contain the same information that was originally reviewed by Appeals in the Integrated Data Retrieval System transcripts, no authority precludes the Court from considering the Forms 4340 in deciding the instant Motions concerning the taxable years at issue. *See, e.g., Bowman v. Commissioner*, T.C. Memo. 2007-114, 2007 WL 1296775, at *7, *aff'd*, 285

**[\*3]** purpose of resolving the present Motions and not as findings of fact in this case. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). Mr. Tooke resided in Florida when he timely filed his Petition.

I. *Background, Liability, Notice, and Request for a Collection Due Process Hearing*

A. *Background*

Mr. Tooke is the executive chairman and a minority partner of the non-publicly traded company Welvie, LLC (Welvie), a surgery decision support company. Mr. Tooke was previously married to his long-time partner of approximately 25 years, Terry Schue. Messrs. Tooke and Schue were divorced in 2014. Sometime thereafter, Mr. Tooke married Loretta Tooke. The liabilities for the taxable years at issue are solely Mr. Tooke's; neither Mr. Schue nor Ms. Tooke is a party to this case.

B. *The Outstanding Liabilities*

Mr. Tooke is liable for self-assessed but unpaid federal individual income tax for taxable years 2012 through 2017. Mr. Tooke filed Form 1040, U.S. Individual Income Tax Return, for each of the taxable years at issue. With the exception of two prepayments for taxable year 2017, Mr. Tooke made no payments before or concurrently with the filing of the Forms 1040. After each Form 1040 was filed, several credits were applied or payments made towards the liabilities, or both, for taxable years 2012, 2013, 2014, and 2017.

C. *Prior Collection Notice*

On June 15, 2017, the IRS sent Mr. Tooke Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320, advising him of the filing of a lien with respect to his unpaid tax liabilities for, inter alia, taxable year 2012 and his right to a hearing with Appeals. Mr. Tooke did not file a request for a CDP hearing for taxable year 2012 in response to the June 15, 2017, NFTL filing.

---

F. App'x 309 (8th Cir. 2008); *see also Berglund v. Commissioner*, T.C. Memo. 2015-239, at \*15 n.8.

**[*4]** D.    *Section 6330 Notice and Request for a Levy Collection Due Process Hearing*

Thereafter, on March 21, 2019, the IRS sent Mr. Tooke Letter 1058, Final Notice, Notice of Intent to Levy and Notice of Your Right to a Hearing (Levy Notice), with respect to the levy years. Mr. Tooke timely requested a section 6330 CDP hearing for the levy years by filing Form 12153, Request for a Collection Due Process or Equivalent Hearing, which was dated April 20, 2019, and was received by Appeals on April 25, 2019 (Levy Form 12153). On that form, Mr. Tooke checked the boxes for the "Offer in Compromise," "Installment Agreement," and "I Cannot Pay Balance" collection alternatives.

Attached to Levy Form 12153 was a letter from Mr. Tooke's representative, dated April 20, 2019, which stated that Mr. Tooke intended to challenge the appropriateness of the collection action and arrange a collection alternative. The letter also stated that Mr. Tooke had endured a series of events that gave rise to the outstanding liabilities, including the theft of most of his personal possessions and a large amount of money, lengthy litigation related thereto, and a large financial loss on a real estate investment. The letter continued, stating that Mr. Tooke's circumstances and efforts to come into "voluntary compliance illustrate that a less intrusive collection method is available." The letter concluded by stating that Mr. Tooke intended to submit an OIC to settle his outstanding liabilities, and by requesting first-time abatement with respect to the additions to tax for the failure to file and failure to pay.

E.    *Section 6320 Notice and Request for a Lien Collection Due Process Hearing*

On April 2, 2019, the IRS sent Mr. Tooke another Letter 3172 with respect to the filing for the lien years.[5] Mr. Tooke timely requested a section 6320 CDP hearing for the lien years by filing Form 12153, which was dated April 26, 2019, and was received by the IRS on April 29,

---

[5] The April 2, 2019, NFTL filing seemingly constitutes the second NFTL filing issued to Mr. Tooke with respect to his income tax liabilities for taxable year 2012. The record shows that the IRS had sent Mr. Tooke another NFTL filing pertaining to taxable years 2013 through 2017, dated March 28, 2019. With regard to making the timeliness determination, it appears that the March 28, 2019, NFTL filing was used as the reference point. Regardless, the request for a section 6320 CDP hearing was timely filed. Since the parties do not address the March 28, 2019, NFTL filing in their pleadings or Motions, we will not either.

[*5] 2019 (Lien Form 12153). On the Lien Form 12153, Mr. Tooke checked the "Offer in Compromise," "Installment Agreement," and "I Cannot Pay Balance" collection alternatives.

Attached to Lien Form 12153 was a letter from Mr. Tooke's representative, dated April 26, 2019, which, similar to the letter attached to his section 6330 CDP request, stated that Mr. Tooke intended to challenge the appropriateness of the collection action and arrange a collection alternative. The letter also noted that Mr. Tooke had recently submitted an OIC to settle his outstanding liabilities.

On or around July 17, 2019, Appeals determined that Mr. Tooke did not timely request a section 6320 CDP hearing with respect to taxable year 2012. However, the request for a section 6320 CDP hearing was timely with respect to taxable years 2013–2017.

II.    *The Collection Due Process Hearing*

Mr. Tooke's section 6330 CDP case was assigned to Appeals Officer Kay A. Pollock (AO Pollock) on July 16, 2019. That same day, AO Pollock verified that she had no prior involvement with Mr. Tooke for the type of tax and years at issue in the section 6330 CDP case (i.e., the levy years), reviewed the case file, and verified that the requirements of any applicable law or administrative procedure were met.

Additionally, AO Pollock noted that the IRS's Collections function (Collections) was in the process of evaluating an OIC that Mr. Tooke had submitted, which the IRS received on April 26, 2019. Accordingly, on July 16, 2019, AO Pollock issued a Letter 4837, Substantive Contact Letter, that, inter alia, advised Mr. Tooke that the IRS had received his Form 656, Offer in Compromise, that his OIC was being reviewed by Collections, and that the CDP hearing would be suspended pending a preliminary recommendation from Collections.

Mr. Tooke's section 6320 CDP case was also assigned to AO Pollock on September 26, 2019. AO Pollock similarly verified that she had no prior involvement with Mr. Tooke for the type of tax and years at issue in the section 6320 CDP case (i.e., the lien years), reviewed the case file, and verified that the requirements of any applicable law or administrative procedure were met. Additionally, AO Pollock once again noted that Collections was still evaluating Mr. Tooke's OIC. Accordingly, on September 26, 2019, AO Pollock issued another Letter 4837 that, inter alia, advised Mr. Tooke that the Lien CDP hearing would be suspended pending a preliminary recommendation from Collections.

[*6]    A.    *Offer-in-Compromise*

Shortly after his request for a section 6330 CDP hearing, Mr. Tooke submitted to the IRS Form 656, which was received by the IRS on April 26, 2019. On his Form 656, Mr. Tooke sought to compromise his outstanding liabilities for taxable years 2012 through 2018 on either the grounds of doubt as to collectibility or effective tax administration (ETA), for a lump sum cash offer of $175,000. Concurrently with the submission of his OIC, Mr. Tooke submitted a payment of $35,000, which was sufficient to fully pay his then-assessed liability for taxable year 2012.[6]

Mr. Tooke also submitted Form 433–A, Collection Information Statement for Wage Earners and Self-Employed Individuals, which shows equity in assets totaling $57,970 (which excluded the value of Mr. Tooke's 13% interest in Welvie[7]), and reflected average gross monthly income of $41,566, average monthly expenses of $32,573, and a total of remaining monthly income of $8,993.[8] Ultimately, Mr. Tooke offered $175,000 to compromise outstanding assessed liabilities totaling approximately $1.6 million.[9]

---

[6] As discussed further *infra* note 16, the $35,000 payment was sufficient to fully pay the then-assessed balance for taxable year 2012. However, this amount was not sufficient to satisfy the remaining balance of accrued but unassessed interest. The IRS subsequently assessed such interest before the issuance of the Notice of Determination.

[7] On May 22, 2019, Mr. Tooke's authorized representative sent a responsive letter to Revenue Officer Stephanie Reale's request for the financial information necessary for Appeals to consider collection alternatives. In the May 22, 2019, letter, Mr. Tooke's representative asserted that despite owning approximately 13% of Welvie, in his view Mr. Tooke did not need to provide financial information relating thereto, such as a Form 433–B, Collection Information Statement for Businesses. It does not appear that the value of Mr. Tooke's equity in Welvie was considered.

[8] The Court notes that on his Form 433–A, dated April 23, 2019, Mr. Tooke represented that he had gross monthly income of $41,566, which extrapolates to total income of $498,792 per year. But the record also contains a child support worksheet, dated December 13, 2019, where Mr. Tooke represented that his gross income totaled $883,000 per year. This discrepancy is not adequately explained in the record. The Court recognizes the possibility that some of the difference (potentially $10,000 per month) could be attributable to reimbursed expenses, as referenced *infra* Background Part II.B, but that would be inadequate to explain the total discrepancy. Despite the Court's questions, this discrepancy does not affect the resolution of this case.

[9] This amount reflects the unpaid liabilities for the levy years. During the pendency of the CDP hearing various payments were made and credits applied to some

**[\*7]**   The Form 656 also included an attached letter, dated April 24, 2019, which explained various aspects of Mr. Tooke's proposed OIC. First, the letter cited several statutes and Internal Revenue Manual (IRM) provisions and outlined various assets that Mr. Tooke claimed were exempt from inclusion in the asset equity calculation or collection. The letter then discussed several aspects of Mr. Tooke's claimed expenses and requested deviation from the national and local standards. Finally, the letter set forth details of the exceptional circumstances claimed that purported to warrant compromise on ETA grounds.

1.   *Expenses Claimed in Excess of National and Local Standards*

With respect to expenses claimed in excess of the IRS national and local standards, Mr. Tooke explained that he suffers from a serious medical condition (discussed further below) and many of the associated expenses are not fully covered by insurance. The letter also stated that Mr. Tooke's wife is currently unemployed and does not have any source of income to contribute to the household expenses. Therefore, Mr. Tooke also pays his wife's healthcare costs. Further, the letter explained that Mr. Tooke provides approximately $2,375 per month to care for his niece, who suffers from a mental health condition, and grandniece. The letter also stated that Mr. Tooke rents a second apartment to serve as his office, which is "necessary for the production of income," and that he incurs monthly ownership expenses for a co-owned cabin in Minnesota.

2.   *Exceptional Circumstances—Prior Relationship*

The April 24, 2019, letter also addressed Mr. Tooke's request for an OIC on ETA grounds. Therein, Mr. Tooke stated that the "federal tax liabilit[ies] at issue arose out of an unfortunate course of events that imposed a significant amount of money, time, and emotional challenges upon the [t]axpayer."

Mr. Tooke explained that he was formerly married to Mr. Schue, his long-time partner of approximately 25 years. In 2007, Messrs. Tooke and Schue moved to Florida where they owned a condominium. That same year, on August 8, 2007, Messrs. Tooke and Schue executed a Cohabitation and Domestic Partnership Agreement, and on December 4,

---

of the taxable years at issue. Further, the liability for taxable year 2018 was later included in the OIC. Near the conclusion of the CDP hearing, on or around November 9, 2020, the outstanding assessed liabilities for all years included in the OIC totaled approximately $1.8 million.

**[*8]** 2007, they executed a revised agreement. These agreements provided for, inter alia, the division of assets and support payments in the event of separation.

In 2010, Messrs. Tooke and Schue decided to sell their condominium for the self-professed purpose of generating funds to pay medical bills and taxes, and fund the construction of a home they were building in Minnesota. However, Mr. Schue, who had a history of opioid addiction and easy access to opioids in south Florida, relapsed. Over the next two years, Mr. Schue was hospitalized and underwent several medical treatments that were not covered by insurance. Despite medical intervention, Mr. Schue's mental health and addiction continued to worsen. But, given their approximately 25 years together, Messrs. Tooke and Schue decided to get married. On August 12, 2011, Messrs. Tooke and Schue were legally married in the State of New York.

In early 2013, a buyer executed a purchase agreement for Mr. Tooke and Mr. Schue's condominium, which was expected to generate postsale proceeds of approximately $440,000 (sale proceeds).[10] The April 24, 2019, letter states that mere hours before closing, Mr. Schue refused to execute the sale documents unless all sale proceeds were deposited into his bank account. Mr. Schue assured Mr. Tooke that he would abide by their plan to use the sale proceeds to pay medical bills and taxes and to finish construction on their Minnesota house. Mr. Tooke capitulated to Mr. Schue's demand.

Thereafter, Mr. Schue purportedly "began a series of extortion attempts" and made false allegations of domestic abuse by Mr. Tooke. After observing Mr. Schue's deteriorating condition, and upon receiving legal advice, Mr. Tooke filed a civil lawsuit to recover his half of the sale proceeds; Mr. Tooke's request for an injunction was denied because it was deemed a domestic dispute that should be heard in family court. However, because same-sex marriage was not legal in Florida at that time, Mr. Tooke could not pursue such recourse.[11]

---

[10] Mr. Tooke's April 24, 2019, letter is inconsistent in references to the amount of the sale proceeds. At varying points, the letter states that the sale proceeds totaled $440,000, while at other points the letter states $540,000. The discrepancy is immaterial to the resolution of the case.

[11] At the time Messrs. Tooke and Schue got married, Florida law prohibited same-sex marriage and did not recognize same-sex marriages lawfully entered in other jurisdictions. *See, e.g.*, *Birchfield v. Armstrong*, No. 4:15-cv-00615, 2017 WL 1319844,

**[*9]**    Upon his return from a business trip in April 2013, Mr. Tooke discovered that Mr. Schue had moved out of the condominium and taken all their possessions, including Mr. Tooke's rare book collection. Over the following year, Mr. Tooke made various efforts to locate Mr. Schue, recover his share of the sale proceeds, and pursue a divorce. In or around October 2013, Mr. Tooke traveled to Minnesota with his then-friend and now-wife Ms. Tooke. During their stay, they discovered that Mr. Schue had entered the cabin where they were staying and removed Mr. Tooke's laptop. Having previously received threats from Mr. Schue, Mr. Tooke contacted the police; ultimately, Mr. Schue returned the laptop and was not arrested.

In November 2013, a mechanics lien was filed against the home that Messrs. Tooke and Schue were building. Ultimately, the builder sued Mr. Tooke and the property went into foreclosure. In July 2014, Mr. Tooke discovered that Mr. Schue had moved to Minnesota, a state where a same-sex couple could pursue a divorce. Mr. Tooke retained a law firm in Minnesota to pursue divorce from Mr. Schue, and the couple was divorced in October 2014. Pursuant to the domestic partnership agreement entered before the marriage, Mr. Tooke had to pay Mr. Schue $168,000 over three years. In total, Mr. Tooke claims that the events related to his separation from Mr. Schue cost him more than $2 million.

### 3.    *Exceptional Circumstances—Medical Diagnosis*

Additionally, in his April 24, 2019, letter, Mr. Tooke explained that he had been diagnosed with Parkinson's disease in 2010. Mr. Tooke stated that he experiences multiple symptoms, including balance issues, depression, tremors, difficulty writing, insomnia, periodic loss of hearing, and memory problems; these symptoms are occasionally worsened by a gastro-intestinal disease with which Mr. Tooke has also been diagnosed. Mr. Tooke characterized the course of his disease as "progressive but slow," and he has historically controlled his symptoms through a balanced diet and exercise.

The letter further stated that Mr. Tooke travels for work weekly; he estimates that he takes approximately 145 flights and spends 100 nights in hotels per year. Mr. Tooke stated that although he works full time, his symptoms "have a significant impact on his ability to travel and are worsened by stress, fatigue," and his gastro-intestinal disease.

---

at *1 (N.D. Fla. Mar. 23, 2017). This made it difficult for couples married in other states to obtain a divorce in Florida.

[*10] Accordingly, the letter states that if Mr. Tooke's "symptoms are unable to be controlled, they could impair his ability to continue working full-time, or, upon a turn for the worse, potentially at all."

B.    *Evaluation of Offer-in-Compromise by Collections*

Mr. Tooke's OIC was transferred to Collections for consideration on May 30, 2019. Offer Specialist Tamara Scruggs (OS Scruggs) was assigned to consider Mr. Tooke's OIC. OS Scruggs calculated that Mr. Tooke had net realizable equity in assets totaling $124,588, future income of $7,941,325, and a reasonable collection potential (RCP) of $8,065,913.

On August 22, 2019, OS Scruggs referred Mr. Tooke's OIC to the ETA Unit that considers OICs that may reflect public policy and equity considerations. By memorandum dated September 10, 2019, ETA Offer Specialist Kimberly Brauer (OS Brauer) declined transfer of the case and determined that the grounds set forth in Mr. Tooke's April 24, 2019, letter did not establish the criteria required for consideration of his OIC under ETA principles. Therein, OS Brauer stated that Mr. Tooke's circumstances did not satisfy the criteria to warrant compromise because of criminal or fraudulent acts of a third party, but rather the direct cause of the liability was Mr. Tooke's failure to pay quarterly estimated taxes for taxable year 2012. OS Brauer stated further that Mr. Tooke did not exercise prudent or responsible judgment by allowing the proceeds of the sale to be deposited into Mr. Schue's account, especially given his knowledge about Mr. Schue's addiction. Finally, the memorandum explained that despite Mr. Tooke's medical condition, Mr. Tooke did not satisfy the standard set forth in the IRM because he was not incapacitated and was still able to tend to financial matters during the time of illness.

Thereafter, on September 16, 2019, OS Scruggs received a call from Mr. Tooke's representative, and they discussed adjustments to the income and asset calculations. After discussion, OS Scruggs excluded from the income calculation amounts received as reimbursement for work-related travel. Further, the parties discussed recurring deposits that Mr. Tooke received from Ms. Tooke that were included in the income calculation. Those recurring deposits related to Mr. Tooke's 2019 sale of his 25% interest in Shamrock Landing Development, LLC (Shamrock Landing), for $238,549, the proceeds of which were deposited into an account in Ms. Tooke's maiden name and, on occasion, transferred to Mr. Tooke. Ultimately, OS Scruggs revised the RCP

[*11] calculation by excluding the recurring transfers from the monthly income calculation and including the total sale proceeds as net realizable equity in the asset calculation. After revision, Mr. Tooke's RCP totaled $3,705,382, comprising net realizable equity in assets of $363,137 and future income of $3,342,245.

On September 19, 2019, Collections made the preliminary determination to reject Mr. Tooke's OIC because he could fully pay the liabilities and because the ETA Unit did not agree that his circumstances warranted compromise. On October 4, 2019, OS Scruggs sent a letter to Mr. Tooke communicating Collections' preliminary decision to reject his proposed OIC.

### C.  *Collection Due Process Hearing in Appeals*

On October 15, 2019, AO Pollock received the OIC back from Collections. That same day, AO Pollock issued a letter to Mr. Tooke, requesting a response, on or before November 14, 2019, to the preliminary determination to reject his OIC. The time to respond was subsequently extended due to a mailing issue.

By letter dated January 3, 2020, Mr. Tooke requested a face-to-face hearing with Appeals. By letter dated January 6, 2020,[12] Mr. Tooke challenged several elements of the RCP calculation and the preliminary determination to reject his OIC. AO Pollock addressed these points in an April 7, 2020, entry in the case activity record[13] and through subsequent calls with Mr. Tooke's representative. We will discuss these points briefly.

First, Mr. Tooke argued that the amount of the sale proceeds from the disposition of his stake in Shamrock Landing should be reduced

---

[12] The record also contains a letter from Mr. Tooke's representative, dated December 2, 2019, which sets forth many arguments similar to those in the letter dated January 6, 2020. However, the January 6, 2020, letter includes more detail on some arguments and discusses the newly claimed special circumstances related to the special needs child.

[13] In the case activity record AO Pollock mentioned receipt of two responses that "appear to be the same," although one was received in full, and the other was partially destroyed by the post office. It is not clear whether the letters were identical or if there were some differences between them. *See supra* note 12. However, AO Pollock's April 7, 2020, entry in the case activity record clearly addresses the arguments raised for the first time in the January 6, 2020, letter. If the letters mentioned in this case activity record entry were not identical, we are satisfied that the arguments set forth in both letters were adequately addressed.

[*12] since Mr. Tooke and his wife occasionally used those funds to pay monthly expenses. AO Pollock rejected this argument and did not reduce the amount of the proceeds from the sale of Mr. Tooke's interest in Shamrock Landing in the asset calculation. AO Pollock reasoned that Mr. Tooke's monthly income was sufficient to pay his required monthly expenses such that he did not need to use those proceeds.[14]

Second, Mr. Tooke argued that the RCP calculation should include an expense for Mr. Tooke's current year taxes. AO Pollock agreed with Mr. Tooke that the RCP calculation should include a monthly expense for his estimated tax payments. AO Pollock allowed a monthly expense of $14,917 for Mr. Tooke's estimated tax payments.

Third, Mr. Tooke argued that given his age and medical condition, Collections' RCP calculation unreasonably assumed that Mr. Tooke could fully pay his liabilities by continuing to work for at least the next 115 months. AO Pollock explained that after the inclusion of a monthly expense for Mr. Tooke's estimated tax payments in the RCP calculation, Mr. Tooke was no longer considered a taxpayer capable of "full[y] pay[ing]" his outstanding liabilities before the expiration of the collection period of limitations. Therefore, the future income multiplier would be reduced to 12 months.

Fourth, Mr. Tooke argued that the ETA Unit's reasoning was in error and that the unit failed to consider the totality of the circumstances justifying acceptance of the OIC. However, AO Pollock agreed with the ETA Unit's preliminary determination to reject Mr. Tooke's ETA OIC. With respect to the circumstances of his prior relationship, AO Pollock stated that Mr. Tooke did not exercise ordinary business care and prudence in his financial decisions. Further, with respect to Mr. Tooke's medical condition, AO Pollock explained that an upward deviation from IRS standards was permitted, but that compromise was not warranted because Mr. Tooke was still able to earn income.

Fifth, Mr. Tooke explained that, as a new special circumstance, he and his wife had recently assumed joint custody of, and were incurring new expenses for, a 12-year-old special needs child that was removed from the previous adoptive parent's home. AO Pollock stated

---

[14] In the case activity record, AO Pollock stated that Mr. Tooke's monthly income was sufficient to pay his "required monthly income." However, given the context, the Court understands the word "income" in the phrase "required monthly income" to be a typographical error and to mean "expenses."

[*13] that Mr. Tooke had already been permitted expenses far above the national and local standards, and so she would not allow any additional amount. Ultimately, after all revisions, AO Pollock computed that Mr. Tooke had an RCP of $532,889 (a significant reduction from the prior RCP calculation of $3,705,382).

On April 27, 2020, AO Pollock received another letter from Mr. Tooke's representative, dated April 21, 2020, as well as other supporting documents (including medical invoices, receipts for school expenses, a narrative letter, and invoices for attorney's fees). The letter stated that the Tookes incurred approximately $41,000 of expenses associated with the adoption of the special needs child, would incur approximately $6,000 more in legal fees, and estimated additional monthly expenses of approximately $4,800. AO Pollock addressed these points and the attachments in an April 27, 2020, entry in the case activity record and through subsequent calls. We will address these points briefly.

First, with respect to the adoption expenses and legal fees, AO Pollock noted that they were one-time expenses and that the expenses would not continue throughout the period for collection. However, during an April 29, 2020, call, AO Pollock explained to Mr. Tooke's representative that if Mr. Tooke could prove he used his and Ms. Tooke's savings to pay the legal fees, she would reduce the amount of the savings for purposes of the RCP calculation.

Second, with respect to the private school expenses, AO Pollock explained that private schooling is not an allowable expense absent documentation that the public school system could not accommodate the child's needs.

Third, with respect to the medical and therapy expenses, AO Pollock reviewed the attached invoices but noted several issues, including that the invoices were in the name of the non-liable spouse, that the invoices stopped after January 31, 2020, and that none of the documents showed that the expenses were actually paid and continuing. During the April 29, 2020, call, AO Pollock and Mr. Tooke's representative discussed what was necessary to substantiate the medical expenses. On May 15, 2020, AO Pollock and Mr. Tooke's representative had another call, and the representative explained that some expenses were still outstanding but that Mr. Tooke would provide proof by May 29, 2020.

**[\*14]** Finally, on the May 15, 2020, call, Mr. Tooke's representative raised the prospect of converting the OIC from a lump-sum payment to a periodic payment OIC, and AO Pollock explained the potential changes to Mr. Tooke's RCP. Additionally, Mr. Tooke's representative indicated that Mr. Tooke incurred additional liability for taxable year 2018, which he wanted to include in the OIC. AO Pollock stated that she would consider adding the liability for taxable year 2018 but that a condition of submitting the OIC was remaining in compliance for future years, and Mr. Tooke's current lack of compliance was problematic.

On May 29, 2020, Mr. Tooke's representative sent AO Pollock another letter that explained the claimed medical and private school expenses, and included additional documents to support the assertions in the letter. However, on July 1, 2020, Mr. Tooke's CDP case was reassigned to Appeals Officer Nathan B. Herring (AO Herring). That same day, AO Herring verified that he had no prior involvement with Mr. Tooke for the type of tax and lien years and levy years at issue in the CDP case.

On October 30, 2020, AO Herring reviewed the case file and verified that the requirements of any applicable law or administrative procedure were met. That same day, AO Herring spoke with Mr. Tooke's representative. During the call AO Herring explained that he would not reduce the asset amount by the adoption-related attorney's fees because that was not an ongoing expense and because Mr. Tooke's monthly net income of $14,146 was sufficient to cover the expense. AO Herring also agreed with Collections' preliminary determination that Mr. Tooke did not satisfy the non-economic hardship ETA criteria.

Further, AO Herring explained that he would not consider additional expenses for items such as food and clothing or housing and utilities because, even including the special needs child, Mr. Tooke had already been allowed expenses in excess of the national and local standards. However, AO Herring said he would consider expenses related to the child's special needs, including private schooling and therapy, if appropriate documentation was provided. AO Herring also confirmed that the OIC would include taxable year 2018 because Mr. Tooke was making estimated tax payments for taxable year 2019 when he submitted the OIC. Finally, at the end of the call, Mr. Tooke's representative revisited the prospect of converting the OIC from a lump-sum OIC to a periodic payment OIC.

**[*15]** On November 6, 2020, AO Herring received a letter and additional supporting documentation from Mr. Tooke's representative. AO Herring reviewed the additional documentation and, despite a lack of a showing that public school could not accommodate the child's needs, AO Herring permitted a monthly expense for private schooling of $1,375 on the basis of the child's situation. However, AO Herring denied the requested $1,000 per month for tutoring given that "one of the arguments used to justify the [private school] expense was the fact that the child would receive more one-on-one learning than in public school."

Additionally, AO Herring permitted a monthly speech therapy expense of $400 but denied the requested $550 per month for an additional transportation expense (applying the federal mileage rate), reasoning that Mr. Tooke could "find a closer specialist." Further, Mr. Tooke requested an additional allowable monthly expense of $2,100 for the child's medical expenses, comprising increased medical insurance premiums, psychiatry and therapy appointments, and an annual retainer to a physician. After review, AO Herring permitted an additional $1,040 per month to cover the increased medical insurance premiums, 40% co-insurance, and payments towards the insurance deductible.[15]

Finally, in his November 6, 2020, letter, Mr. Tooke asked to retain $85,000 in emergency reserves "in contemplation of the reasonably foreseeable medical expenses in the near future, based on the special circumstances" presented by Mr. Tooke's medical condition and that of his adopted special needs child. He claimed that such events present a high likelihood of economic hardship. AO Herring noted that Collections rejected a similar argument, and he too rejected Mr. Tooke's request, and further explained that Mr. Tooke has significant monthly income and has been allowed expenses well in excess of the national and local standards in consideration of these special circumstances.

Accordingly, after revisions, AO Herring calculated that Mr. Tooke had net realizable equity in assets totaling $363,137, future net income over the next 12 months of $135,972, and an RCP of $499,109. On November 9, 2020, AO Herring and Mr. Tooke's representative discussed the adjustments to the calculation, and AO Herring explained, inter alia, that no additional allotment would be given for mileage

---

[15] It appears that AO Herring may have erred in petitioner's favor when he stated that the 40% co-insurance amount of the $1,475 monthly psychiatry and therapy expenses totaled $640 per month; the amount equals $590 per month.

[*16] because the taxpayer had already been allowed expenses in excess of the applicable standard. AO Herring further explained that an expense for in-home tutoring would not be allowed because the private schooling expense had been allowed and the justification for the private schooling expense was that the child would receive personalized one-on-one instruction.

Further, AO Herring explained the denial of the request to maintain $85,000 in emergency reserves. He noted the lack of documentation showing that the funds would be needed to cover unexpected medical costs in the future that are not covered by health insurance or that had not already been permitted. AO Herring further explained that he agreed with the previous settlement officer. Specifically, the amount of cash in the asset calculation would not be reduced—despite Mr. Tooke's claim that the cash would be used for foreseeable future medical expenses—because he had sufficient income to pay monthly living expenses. AO Herring also noted that the cash could be considered a dissipated asset. At the end of the call Mr. Tooke's representative raised constitutional arguments.

On November 11, 2020, Mr. Tooke's representative sent AO Herring a fax to inform him that Mr. Tooke could not agree to a lump sum OIC of $499,109 or a partial-pay IA (PPIA) of $11,331 per month. Therein, Mr. Tooke's representative stated that acceptance of either the proposed OIC amount or an IA would cause a high likelihood of economic hardship. His representative argued that Mr. Tooke's acceptance of either collection alternative would result in an inability to afford his family's monthly expenses, given the current additional expenses and potential future medical costs for the special needs child.

He further argued that acceptance of either option would render Mr. Tooke unable to financially survive sudden changes that could occur if Mr. Tooke were to suffer a significant medical event. He also argued that accepting either option would render Mr. Tooke unable to maintain future compliance with federal tax obligations (or a combination of the foregoing possibilities).

On November 12, 2020, AO Herring noted in the case activity record that the argument about future medical expenses was "based on a possibility" and that Mr. Tooke had sufficient income and assets to pay an OIC of $499,109. Further, AO Herring noted that if Mr. Tooke believed that agreeing to an OIC of $499,109 might prevent him from meeting his future tax obligations for the next five years, then AO

**[\*17]** Herring questioned whether Mr. Tooke would agree to any OIC since all accepted OICs require filing and payment compliance for future obligations.

On December 14, 2020, AO Herring reviewed Mr. Tooke's request for a CDP hearing and noted that he had requested first-time abatement and reasonable cause abatement for the failure to file and failure to pay additions to tax. After review, AO Herring noted that there was no documentation to support a reasonable cause abatement. Nevertheless, AO Herring reviewed account transcripts for the three years preceding the taxable years at issue and concluded that Mr. Tooke was eligible for first-time abatement with respect to the addition to tax for the failure to file, which had been assessed for taxable year 2012.

On January 5, 2021, Appeals Team Manager Rhonda R. Warren issued the Notice of Determination rejecting Mr. Tooke's proposed OIC and sustaining both the NFTL for the lien years and the proposed levy actions for the levy years. On January 11, 2021, an abatement of $40,271 was posted to Mr. Tooke's account for taxable year 2012.[16]

*Discussion*

I.    *Motion to Dismiss as to Taxable Year 2012*

Concurrent with the filing of his Motion for Summary Judgment respondent also filed a Motion to Dismiss on Ground of Mootness. Therein, respondent asks the Court to dismiss this case as moot with respect to the collection activity under sections 6320 and 6330 regarding Mr. Tooke's tax liability for taxable year 2012, which has been paid in full. *See supra* note 16.

In *Commissioner v. Zuch*, 145 S. Ct. 1707 (2025), the Supreme Court held that this Court lacks jurisdiction to resolve a dispute between

---

[16] In addition to the $35,000 payment made in connection with the OIC on April 26, 2019, *see supra* Background Part II.A, on October 21, 2020, an "overpaid credit applied" of $2,135 was posted to Mr. Tooke's account for taxable year 2012; this credit caused his account balance for taxable year 2012 to be overpaid (i.e., have a negative balance) by the same amount. Subsequently, on December 14, 2020, the IRS assessed additional interest of $2,135; the additional assessment resulted in a zero-dollar balance for Mr. Tooke's account for taxable year 2012. On December 28, 2020, Mr. Tooke made a subsequent payment of $361, and his account balance was once again overpaid (i.e., negative). After closing the CDP hearing, the IRS abated the addition to tax for the failure to file and the associated interest for taxable year 2012, and Mr. Tooke's account balance was, in total, overpaid by $40,631.71.

**[\*18]** a taxpayer and the Commissioner under section 6330 when the Commissioner is no longer pursuing a levy. *See, e.g., Commissioner v. Zuch*, 145 S. Ct. at 1714 ("Because there was no longer a proposed levy, the Tax Court properly concluded that it lacked jurisdiction to resolve questions about [a taxpayer's] disputed tax liability."); *see also Greene-Thapedi v. Commissioner*, 126 T.C. 1, 7 (2006). The record establishes that following a series of payments, credits, and assessments, Mr. Tooke's account for taxable year 2012 reached a zero balance and was subsequently overpaid. *See supra* Background Part II.C; *see also* note 16. The record further establishes that the IRS posted an abatement of $40,271 to Mr. Tooke's account for taxable year 2012 on January 11, 2021. *See supra* Background Part II.C; *see also* note 16. On this record, there can no longer be a proposed levy for taxable year 2012.

Accordingly, the Court will grant respondent's Motion to Dismiss on Ground of Mootness, and insofar as this case concerns respondent's determination regarding the proposed levy action against Mr. Tooke for taxable year 2012, the Court will dismiss as to that year for lack of jurisdiction.[17]

## II. *General Principles*

### A. *Summary Judgment Standard*

Summary judgment serves to "expedite litigation and avoid unnecessary and expensive trials." *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). We may grant summary judgment when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See* Rule 121(a)(2); *Sundstrand Corp.*, 98 T.C. at 520. In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the non-moving party. *Sundstrand Corp.*, 98 T.C. at 520. The non-moving party may not rest on the allegations or denials in its pleadings but must set forth specific facts showing that there is a

---

[17] In the alternative, we find that any arguments relating to the verification requirement and the balancing analysis have been conceded. *See* Rule 331(b)(4). As noted *supra* notes 6 and 16, it appears to the Court that Mr. Tooke's liability for taxable year 2012 was fully satisfied days before Appeals issued the Notice of Determination. However, Mr. Tooke did not raise either argument in his Petition. Further, in his Motion for Summary Judgment and his Opposition to Respondent's Motion for Summary Judgment, Mr. Tooke expressly disclaims any challenge to the verification requirement. Moreover, even if there was an abuse of discretion, the Court lacks jurisdiction because respondent is no longer pursuing a levy for taxable year 2012. *See Commissioner v. Zuch*, 145 S. Ct. at 1714.

**[\*19]** genuine dispute for trial. Rule 121(d); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). On the basis of the record before the Court, we conclude that this case is appropriate for summary adjudication.

## B.     *Standard of Review*

This Court has jurisdiction to review the administrative determination made by Appeals. *See* § 6330(d)(1). Where, as here, the underlying liability was not properly at issue, we will review Appeals' determination for abuse of discretion. *Sego v. Commissioner*, 114 T.C. 604, 610 (2000); *Goza v. Commissioner*, 114 T.C. 176, 182 (2000). An abuse of discretion occurs if the Appeals officer exercises discretion "arbitrarily, capriciously, or without sound basis in fact or law." *Woodral v. Commissioner*, 112 T.C. 19, 23 (1999); *see also Giamelli v. Commissioner*, 129 T.C. 107, 111 (2007); *Murphy v. Commissioner*, 125 T.C. 301, 308, 320 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006).

"[W]e judge the propriety of [Appeals'] determination . . . on the grounds invoked by . . . Appeals." *See Serna v. Commissioner*, T.C. Memo. 2022-66, at \*8 (first alteration in original) (quoting *Elkins v. Commissioner*, T.C. Memo. 2020-110, at \*24); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Antioco v. Commissioner*, T.C. Memo. 2013-35, at \*25 ("Applying *Chenery* in the CDP context means that we [cannot] uphold a notice of determination on grounds other than those actually relied upon by the Appeals officer."). "[W]e look to the reasons offered in the notice of determination, as further unspooled in the settlement officer's contemporaneous rejection memorandum and case activity notes." *Serna*, T.C. Memo. 2022-66, at \*8; *accord Melasky v. Commissioner*, 151 T.C. 93, 106 (2018) ("[W]e will uphold a notice of determination of less than ideal clarity if the basis for the determination may reasonably be discerned . . . ."), *aff'd*, 803 F. App'x 732 (5th Cir. 2020); *Kasper v. Commissioner*, 150 T.C. 8, 24–25 (2018). "Although we may not accept any *post hoc* rationalizations for agency action provided by the Commissioner's counsel, we may consider any 'contemporaneous explanation of the agency decision' contained in the record." *Kasper*, 150 T.C. at 24–25 (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 738 (D.C. Cir. 2001)).

[*20] III.    *Analysis*

A.    *Statutory Framework*

We review AO Herring's determinations for abuse of discretion, and we consider whether he (1) properly verified that the requirements of any applicable law or administrative procedure were met; (2) considered any relevant issues raised by Mr. Tooke; and (3) considered whether the proposed collection action balances the need for the efficient collection of taxes with Mr. Tooke's legitimate concern that any collection action be no more intrusive than necessary. *See* § 6330(c)(3); *Sego*, 114 T.C. at 609.

B.    *Verification Requirement*

First, this Court has authority to review satisfaction of the verification requirement regardless of whether the taxpayer raised that issue at the CDP hearing. *See Hoyle v. Commissioner,* 131 T.C. 197, 202–03 (2008), *supplemented by* 136 T.C. 463 (2011). In his Petition, Mr. Tooke does not assign error or advance any argument regarding the satisfaction of the verification requirement. *See* Rule 331(b)(4) ("Any issue not raised in the assignments of error shall be deemed to be conceded."). Additionally, in both his Motion for Summary Judgment and his Opposition to Respondent's Motion for Summary Judgment, Mr. Tooke concedes that he is not challenging the satisfaction of the verification procedure under section 6330(c). *See also* § 6320(c). Accordingly, we find that any such issue has been conceded.

C.    *Issues Raised by the Taxpayer*

Second, at the CDP hearing a taxpayer may raise "any relevant issue relating to the unpaid tax or the proposed levy," including appropriate spousal defenses, challenges to the appropriateness of the collection actions, or offers of collection alternatives. *See* §§ 6320(c); 6330(c)(2)(A). On his Forms 12153, Mr. Tooke checked the boxes for "Installment Agreement," "Offer in Compromise," and "I Cannot Pay Balance." Ultimately, Mr. Tooke's section 6320 CDP hearing and request for collection alternatives were considered in conjunction with his section 6330 CDP hearing and the request for the same collection

**[\*21]** alternatives. *See* § 6320(b)(4). First, we will discuss Mr. Tooke's OIC, and then we will discuss the IA collection alternative.[18]

### 1. *Offer-in-Compromise*

Mr. Tooke requested an OIC collection alternative. The Code gives the Commissioner wide discretion to compromise tax liabilities. *See* § 7122(d)(1); Treas. Reg. § 301.7122-1(c). The Commissioner is authorized to compromise an outstanding tax liability on multiple grounds, including doubt as to liability, doubt as to collectibility, and ETA. *See* § 7122(a); Treas. Reg. § 301.7122-1(b).

Generally, an Appeals officer is directed to reject any doubt as to collectibility offer that is substantially below the taxpayer's RCP. *See Mack v. Commissioner*, T.C. Memo. 2018-54, at \*10 (first citing Rev. Proc. 2003-71, § 4.02(2), 2003-2 C.B. 517, 517; and then citing *Johnson v. Commissioner*, 136 T.C. 475, 485–86 (2011), *aff'd*, 502 F. App'x 1 (D.C. Cir. 2013)). However, an Appeals officer can accept an offer of less than the taxpayer's RCP if special circumstances justify acceptance of some lower amount. *See Brombach v. Commissioner*, T.C. Memo. 2012-265, at \*21–22. Special circumstances exist when either (1) a taxpayer would suffer economic hardship if the IRS were to collect an amount equal to the taxpayer's RCP or (2) circumstances justify acceptance of an amount less than the RCP, on the basis of considerations of public policy or equity. *See Murphy*, 125 T.C. at 309 (citing IRM 5.8.4.3.4 (Sep. 1, 2005)); *see also* IRM 5.8.4.3(4) and (5) (Sep. 24, 2020).

Mr. Tooke's OIC was based on doubt as to collectibility, and he also argued that special circumstances warranted compromise on the

---

[18] On his Forms 12153, Mr. Tooke checked the box for the "I Cannot Pay Balance" collection alternative, which is also known as currently not collectible status. *See, e.g.*, *Ragsdale v. Commissioner*, T.C. Memo. 2019-33, at \*34–35. Additionally, during the CDP hearing Mr. Tooke requested a face-to-face hearing, and it is not clear whether Appeals ever addressed this request. However, Rule 331(b)(4) provides that a Petition "shall contain . . . [c]lear and concise assignments of each and every error that the petitioner alleges to have been committed in the notice of determination. Any issue not raised in the assignments of error shall be deemed to be conceded." Mr. Tooke did not raise any arguments about currently not collectible status or the failure to address the request for a face-to-face hearing in his Petition. Accordingly, we find that Mr. Tooke has waived those arguments, and we need not address them. *See, e.g.*, *Hartmann v. Commissioner*, T.C. Memo. 2024-46, at \*10, *aff'd*, No. 24-2289, 2025 WL 213765 (3d Cir. Jan. 16, 2025).

[*22] ETA grounds of economic hardship or public policy or equity. We will discuss these points in turn.

a. *Doubt as to Collectibility and Mr. Tooke's Reasonable Collection Potential*

When considering an OIC like Mr. Tooke's, the IRS analyzes the taxpayer's ability to pay by calculating his RCP. While calculating the RCP is complicated, the goal is easy to understand: It is the IRS's estimate of what it might get from seizing and selling a taxpayer's property and garnishing his income. *See Brombach*, T.C. Memo. 2012-265, at *5 (citing IRM 5.8.4.4.1 (Sep. 1, 2005)); *see also* IRM 5.8.4.3.1 (Apr. 30, 2015). After several revisions, AO Herring determined that Mr. Tooke had an RCP of $499,109, comprising net realizable equity in assets totaling $363,137 and future net income over the next 12 months of $135,972. AO Herring rejected Mr. Tooke's OIC because the $175,000 offered, which was later increased to $375,000, was less than his RCP of $499,109.

Mr. Tooke argues that rejection of his OIC was an abuse of discretion, that the RCP calculation was flawed for several reasons, and that Appeals abused its discretion by disallowing approximately $1,550 per month of expenses. Mr. Tooke's Motion for Summary Judgment does not specify what these expenses are, but on the basis of the Administrative Record, we assume that the $1,550 of expenses comprise approximately $1,000 per month for in-home tutoring for the special needs child and approximately $550 per month for costs associated with transporting the child to private school (calculated using the federal mileage rate).

Mr. Tooke argues that these expenses qualified under the "necessary expense test" since they were "necessary . . . for the health and welfare" of Mr. Tooke's family, namely the special needs child. *See* IRM 5.8.5.22.1 (Oct. 22, 2010). Accordingly, Mr. Tooke contends that these expenses should have been permitted, which would have the effect of further reducing his RCP.

However, assuming arguendo that these expenses meet the necessary expense test, we still find that it was not an abuse of discretion to deny Mr. Tooke's OIC. *See Brombach*, T.C. Memo. 2012-265, at *21. As explained above, in the absence of special circumstances the Commissioner will generally accept an OIC based on doubt as to collectibility only if it equals a taxpayer's RCP. *See* Rev. Proc. 2003-71,

[*23] § 4.02(2), 2003-2 C.B. at 517. In this case the expenses at issue total approximately $1,550 per month or approximately $18,600 per year.[19] Appeals determined that Mr. Tooke's RCP was $499,109. For the sake of this analysis, reducing the RCP calculation by $18,600 would equal a recomputed RCP of $480,509 (which we will refer to as our favorable recalculation of the RCP). However, Mr. Tooke's proposed OIC was for $375,000, which was $124,109 less than his RCP and $105,509 less than our favorable recalculation of his RCP.

This Court has consistently held that the Commissioner does not abuse his discretion by rejecting an OIC that falls short of a taxpayer's RCP. *See Brombach*, T.C. Memo. 2012-265, at *21 (first citing *Murphy*, 125 T.C. at 320–21; and then citing *Lemann v. Commissioner*, T.C. Memo. 2006-37, 2006 WL 549206, at *10); *see also, e.g., Estate of Baumgardner v. Commissioner*, T.C. Memo. 2024-80, at *17. Accordingly, since Mr. Tooke offered less than his RCP, it was not an abuse of discretion to reject his OIC unless AO Herring abused his discretion in failing to properly consider the special circumstances Mr. Tooke claimed or in failing to meet some other procedural requirement of the CDP process.[20] *See Mack*, T.C. Memo. 2018-54, at *10.

---

[19] The record supports varying amounts for the exact combined amount of these two expenses. With respect to the claimed expense for transporting the special needs child to and from private school, the record reflects a claimed expense of $561 per month. With respect to the claimed tutoring expense, we note that Mr. Tooke's November 6, 2020, letter states that the monthly expense is approximately $1,000. However, the record reflects an initial claimed expense as low as $400 per month, and the tutoring expense spreadsheet, which includes several non-tutoring-related expenses and math errors, suggests a monthly expense of approximately $973. We have chosen to rely on Mr. Tooke's own claimed expense of $1,550 per month; but even if we were to double the amount of the disputed expenses, our analysis would be unchanged.

[20] As noted above, *supra* Background Part II.C, Mr. Tooke's representative sent a letter dated November 11, 2020. On November 12, 2020, AO Herring reviewed the arguments in the letter and input an entry into the case activity record. Therein AO Herring questioned whether Mr. Tooke would agree to an OIC in any amount given his claims that acceptance of an OIC would prevent him from meeting his future tax obligations. Regardless of AO Herring's query, the record clearly shows that Mr. Tooke did not increase his offer to match his RCP. So, whether Mr. Tooke would have accepted some other amount is irrelevant absent an abuse of discretion in determining the RCP. As discussed below, we find that Appeals did not abuse its discretion. Further, in this circumstance (i.e., Mr. Tooke did not increase the amount of his OIC to match his RCP), Mr. Tooke has not articulated any reason why AO Herring's query about his willingness to accept any OIC constitutes an abuse of discretion.

**[\*24]**             b.       *Special Circumstances*

Next, Mr. Tooke contends that in the light of his special circumstances it was an abuse of discretion to deny his OIC. As mentioned above, a doubt as to collectibility OIC with special circumstances is appropriate when a taxpayer cannot pay the liability in full and, on account of those special circumstances, the taxpayer has offered an amount lower than his RCP. IRM 5.8.11.3(2) (Oct. 4, 2019). A doubt as to collectibility OIC with special circumstances is considered using the same factors as ETA OICs, namely economic hardship or public policy and equity. IRM 5.8.4.2(4) (May 10, 2013). We will address Mr. Tooke's arguments in turn.

i.       *Economic Hardship*

Mr. Tooke contends that it was an abuse of discretion to deny his request to maintain emergency reserves of $85,000 (and therefore to not reduce his RCP by that amount). During the CDP hearing Mr. Tooke argued, in relevant part, that the emergency reserves were necessary to negate possible future economic hardship that might occur should he suffer a debilitating medical event as a result of his Parkinson's diagnosis or, alternatively, should his special needs child have another emergency medical event. Therefore, "in contemplation of the reasonably foreseeable medical expenses in the near future, [and] based on the special circumstances involved and in order to avoid economic hardship," Mr. Tooke requested permission to maintain the emergency reserves.

In the Notice of Determination, AO Herring rejected the request to allow Mr. Tooke to maintain emergency reserves and stated that "[t]here [was] no documentation provided to show the funds [would] be required in the future." The Notice of Determination later stated that "[t]he Appeals Officer noted there is no indication of a guaranteed hardship and the offer figures should not be adjusted based on what you believe may happen in the future." However, AO Herring "reiterated that [Mr. Tooke was] allowed well above the standards for necessary living expenses as well as allowances for multiple other expenses in order to accommodate [his] situation."

Further to this point, the Administrative Record reflects that while his OIC was under consideration by Collections, the ETA Unit declined transfer of Mr. Tooke's OIC and stated that to compromise with the taxpayer's "offer would not promote effective tax administration . . .

**[\*25]** because the taxpayer has been able to attend to financial matters and has been actively engaged in successful business." Additionally, while considering Mr. Tooke's OIC as part of the CDP hearing, AO Herring noted in the case activity record that "no documentation or verification [was] provided to show that the funds [would] be needed to cover unexpected medical costs in the future that [would] not be covered by health insurance or that . . . have not already [been] allowed for with the increased out of pocket health expenses."

We agree with Appeals and find that it was not an abuse of discretion to reject compromise on the claimed grounds of economic hardship. Mr. Tooke takes issue with the specific language of the Notice of Determination, which states in part that "there is no indication of a guaranteed hardship and the offer figures should not be adjusted based on what you believe may happen in the future." In his Motion for Summary Judgment, Mr. Tooke cites *Mason v. Commissioner*, T.C. Memo. 2021-64, at \*17, and argues that in evaluating OICs, "Appeals was required to '*predict* whether' the information provided illustrated that the proposed offer 'would create economic hardship for the taxpayer.'" Mr. Tooke further argues that the determination was unreasonable because Appeals required him to provide a "guaranteed hardship" as opposed to a high likelihood of hardship to occur.

However, Appeals' reasoning was fully consistent with the applicable rules and caselaw. Compromise to promote ETA on the ground of economic hardship is appropriate when the Secretary determines that, although collection could be achieved, collection would cause the taxpayer economic hardship. *See* Treas. Reg. § 301.7122-1(b)(3)(i). Economic hardship occurs if the taxpayer is "unable to pay his or her reasonable basic living expenses." Treas. Reg. § 301.6343-1(b)(4)(i). "The determination of a reasonable amount for basic living expenses . . . will vary according to the unique circumstances of the individual taxpayer. Unique circumstances, however, do not include the maintenance of an affluent or luxurious standard of living." *Id.*

In the Notice of Determination, AO Herring noted that despite Mr. Tooke's medical condition he was still able to work and produce income. Further, AO Herring explained that Mr. Tooke has "significant monthly income," to the tune of approximately $42,000, and that "expenses have been allowed well beyond the local/national standards," including "[a]dditional expenses . . . allowed to promote the care and well-being of [Mr. Tooke] and the special needs child."

**[\*26]** Rather than suffering from current economic hardship, Mr. Tooke rests his argument on the hypothetical occurrence of a medical event that might require hospitalization for himself or the special needs child. Appeals determined that "[t]here [was] no documentation provided to show the funds will be required in the future," and we agree.

The record includes some of Mr. Tooke's medical records, but they do not speak to the likelihood of the hypothetical medical event nor establish the need to retain such emergency reserves. *See, e.g., Fargo v. Commissioner*, 447 F.3d 706, 710 (9th Cir. 2006) (holding that it is not an abuse of discretion for Appeals to disregard claimed medical expenses that are speculative), *aff'g* T.C. Memo. 2004-13. At the time Mr. Tooke submitted his OIC, he was not retired, and while he was diagnosed with an illness, he was still able to earn considerable income. In evaluating his ability to pay, Appeals permitted Mr. Tooke expenses in consideration of his and his special needs child's medical situations. Ultimately, the key question is whether, after collection of an amount equal to Mr. Tooke's RCP, he would suffer economic hardship or would be left with adequate means to provide for basic living expenses. *See Brombach*, T.C. Memo. 2012-265, at \*24. The record establishes Mr. Tooke's ability to pay his basic living expenses, and that it was not an abuse of discretion to conclude as much.

ii.    *Non-Economic Hardship*

Next, Mr. Tooke argues that it was an abuse of discretion for Appeals to reject compromise in the light of the circumstances caused by his former spouse. Mr. Tooke asserts that his "financial straits were a direct result of the unfortunate series of events that occurred involving his former spouse. And while Petitioner substantiated the course of events, which included theft, extortion, and protracted litigation, through voluminous documentation, the ETA Unit improperly rejected such explanation."

In the Notice of Determination, AO Herring stated that Collections considered the circumstances caused by Mr. Tooke's former spouse and "determined there was no evidence the funds taken by your ex-spouse were the cause of your unpaid tax liabilities." In the Notice of Determination, AO Herring further explained that "the outstanding tax liabilities began to accrue in tax year 2012 when you were supposed to make estimated tax payments, [but that Mr. Tooke] did not exercise prudent and responsible business actions by allowing the funds to be

**[\*27]** deposited into a bank account of someone with a claimed addiction and/or mental disorder."

The Administrative Record further illuminates this analysis. In the case activity record, AO Herring recorded his "agreement with Collections that [Mr. Tooke] does not meet the criteria for acceptance under ETA non-economic hardship." In rejecting the non-economic hardship grounds set forth by Mr. Tooke, Collections cited IRM 5.8.11.2.2.1(4) (Aug. 5, 2015)[21] for the proposition that relief is permissible if a criminal or fraudulent act of a third party is directly responsible for the tax liability. The same part continues, stating that "[t]he taxpayer should be able to provide supporting documentation that the act occurred and was the direct cause of the delinquency," that the crime was of a nature that despite prudent and responsible business actions the taxpayer was misled to believe the tax obligations were properly addressed, and that there should be evidence that the funds required for the payment of the taxes were segregated or otherwise identified and were available to pay the taxes in a timely manner. *Id.*

Collections reasoned that the circumstances identified by Mr. Tooke "do not establish the criteria required for consideration under effective tax administration based on the criminal or fraudulent acts of a third party" since "[t]he funds taken by Mr. Schue in the sale of the jointly held property [were] not the direct cause of the tax liability." Collections explained that the liability for taxable year 2012 resulted from Mr. Tooke's failure to pay quarterly estimated taxes. Further, Collections also noted that Mr. Tooke "did not exercise prudent and responsible business actions by allowing the funds [from the property sale] to be deposited into the account of Mr. Schue when he knew that Mr. Schue was suffering from a drug addiction." Further, Collections also reasoned that the "transaction of the funds being deposited into Mr. Schue's account . . . does not indicate a criminal or fraudulent act."

We hold that Appeals did not abuse its discretion by rejecting the claim that the outstanding liabilities were attributable to a criminal or fraudulent act of a third party. Mr. Schue was a part owner of the property and the proceeds from the property sale were deposited into his account. On this record it would be hard for us to conclude that Appeals

---

[21] The Court notes that Appeals cited the prior version of this provision. IRM 5.8.11.2.2.1(4) was superseded and renumbered to IRM 5.8.11.3.2.1(4) (Oct. 4, 2019), which was in effect during Mr. Tooke's CDP hearing. This discrepancy does not have a material impact on this analysis.

[*28] abused its discretion when it determined that the circumstances failed to demonstrate a criminal or fraudulent act of a third party.

Further, we agree with Appeals that under the circumstances, Mr. Tooke's actions reflected a lack of prudence. In his Motion, Mr. Tooke claims that "the nature of . . . [Mr. Schue's] mental issues prevented reasonably foreseeing the resulting events. There had been no indication that his former spouse, whom Petitioner had tirelessly helped guide through rehab and recovery from addiction, would suddenly relapse and plan a series of events that would unravel their seemingly healthy marriage." However, that argument is belied by, inter alia, Mr. Tooke's April 24, 2019, letter, which states that, Mr. Schue's addiction "spiraled out of control," requiring considerable care over the course of two years, and that despite his treatment "Mr. Schue's mental health and addiction continued to worsen" up to the time of the sale of the property.

Mr. Tooke also argues that Appeals failed to consider alternate grounds in IRM 5.8.11.2.2.1(8),[22] which states that "[t]here may be other circumstances involved in a case that would lead a reasonable third party to conclude that acceptance of the OIC would be fair, equitable, and promote effective tax administration." *See also* Treas. Reg. § 301.7122-1(c)(1). The part continues, stating that "[o]ther factors not discussed above or in the IRM, may be present to support the conclusion that the case presents compelling public policy or equity considerations sufficient to justify compromise." *Id.* However, the record demonstrates that Appeals thoroughly considered each of the foregoing grounds set forth by Mr. Tooke and rejected his OIC, even in the light of the claimed special circumstances.

We conclude that Appeals did not abuse its discretion in denying Mr. Tooke's OIC in the light of the circumstances presented.

### 2. *Partial-Pay Installment Agreement*

Section 6159(a) authorizes the Commissioner to enter into a written agreement allowing a taxpayer to pay a liability in installments if the "agreement will facilitate full or partial collection of such liability." The decision to accept or reject an IA lies within the discretion of the

---

[22] Similar to the discussion *supra* note 21, Appeals cited the prior version of this provision. IRM 5.8.11.2.2.1(8) was superseded and renumbered to IRM 5.8.11.3.2.1(8), which was in effect during Mr. Tooke's CDP hearing. This discrepancy does not have a material impact on this analysis.

[*29] Commissioner. *See Thompson v. Commissioner*, 140 T.C. 173, 179 (2013) (first citing *Kuretski v. Commissioner*, T.C. Memo. 2012-262, at *9, *aff'd*, 755 F.3d 929 (D.C. Cir. 2014); and then citing Treas. Reg. § 301.6159-1(a), (c)(1)(i)). Generally, IAs "should reflect taxpayers' ability to pay on a monthly basis throughout the duration of agreements." IRM 5.14.1.4(4) (Sep. 22, 2021). The settlement officer should analyze a taxpayer's income and allowable expenses to determine the amount of disposable income the taxpayer has available for payment under an IA; this is the minimum amount that a settlement officer may accept under an IA. *See Boulware v. Commissioner*, T.C. Memo. 2014-80, at *29, *aff'd*, 816 F.3d 133 (D.C. Cir. 2016). The IRM also advises settlement officers to analyze all relevant facts in considering acceptance of an IA, including the taxpayer's compliance history, ability to pay, and equity in assets. IRM 8.22.7.5(5) (Aug. 26, 2020).

All taxpayers are expected to immediately pay their delinquent tax liabilities in full. IRM 5.14.2.1.1(1) (Apr. 26, 2019). However, if a taxpayer is unable to fully pay his liabilities before the expiration of the period of limitations but has some ability to pay, then he may be eligible for a PPIA. IRM 5.14.1.1.1(1) (Sep. 22, 2021). Before a PPIA may be granted, "equity in assets must be addressed and, if appropriate, be used to make payment." IRM 5.14.2.2(2) (Apr. 26, 2019). A taxpayer is required to make a good faith attempt to use the equity in assets, and a taxpayer who fails to do so will be considered a "won't pay," in which case "seizure/levy action may be appropriate." IRM 5.14.2.2.2(3) and (4) (Apr. 26, 2019).

In determining whether a PPIA is appropriate, Appeals once again considered Mr. Tooke's ability to pay. *See supra* Discussion Part III.C.1.a. As applicable here, Mr. Tooke argues that rejection of his PPIA was an abuse of discretion and contends that the ability to pay calculation was flawed because AO Herring denied approximately $1,550 of expenses. As noted above, *see supra* Discussion Part III.C.1.a, on the basis of the Administrative Record we assume that these expenses are approximately $1,000 per month for in-home tutoring for the special needs child and approximately $550 per month for costs associated with transporting the special needs child to private school (calculated using the federal mileage rate). Mr. Tooke argues that these expenses qualified under the "necessary expense test" since they were "necessary . . . for the health and welfare" of Mr. Tooke's family, namely the special needs child. *See* IRM 5.8.5.22.1.

**[\*30]** Under the IRM, allowable expenses include those that meet the necessary expense test. *See* IRM 5.15.1.8(1) (July 24, 2019). A "necessary expense" is defined as an expense that is "necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income." *Id.* Allowable expenses include, inter alia, "Allowable Living Expenses," which are typically based on the national and local standards, and "Other Necessary Expenses." *Id.* If the national or local standards are inadequate to provide for a taxpayer's basic living expenses, then a taxpayer must provide reasonable substantiation to support a deviation. *See* IRM 5.15.1.8(6). Other necessary expenses are ones that meet the necessary expense test and are normally allowed, but the expenses must be reasonable considering the taxpayer's individual facts and circumstances. IRM 5.15.1.8(9); *see also* IRM 5.15.1.11(1) (Aug. 29, 2018).

Consistent with Appeals' determination, we find that it was not an abuse of discretion to reject these expenses. With respect to the education-related expenses, namely private school tuition and tutoring, the record reflects that they were considered concomitantly and that the reasoning is intertwined. Tuition for private school is allowable "[i]f it is required for a physically or mentally challenged child and no public education providing similar services is available." *See* IRM 5.15.1.11(3) (table).

AO Herring noted that Mr. Tooke failed to provide sufficient documentation that the local public schools could not accommodate the special needs of the adopted child. However, AO Herring determined that he would nevertheless permit the monthly expense of $1,375 for private schooling in consideration of the situation. But he then disallowed the tutoring expense of $1,000 per month (the lower amount) since, inter alia, "one of the arguments used to justify the [private school] expense was the fact that the child would receive more one-on-one learning than in a public school."

We understand AO Herring's rationale to be rooted in reasonableness. AO Herring had already permitted significant monthly expenses for Mr. Tooke in consideration of his circumstances, including a monthly expense for private schooling. In this situation, we find that it was not an abuse of discretion to disallow the monthly tutoring expenses.

Further, we find that it was not an abuse of discretion to deny the claimed transportation expense to drive the special needs child to

[*31] private school. The broader Administrative Record elucidates the denial of this expense in the Notice of Determination. In relevant part, AO Herring stated in the case activity record that Appeals would "not allow [the $550 transportation expense] since the taxpayer has already been allowed more than the standard for vehicle operating costs." The record reflects that AO Herring permitted monthly vehicle expenses of $700. To allow a deviation from the national and local standards, a taxpayer must provide reasonable substantiation to support the deviation. *See* IRM 5.15.1.8(6). However, the record does not reflect the amount of transportation-related expenses that were actually incurred. Further, the claimed transportation expenses of $550 were calculated using the federal mileage rate, but that amount was not explained in any detail, and it is not clear that the claimed amount reflects the actual expense incurred. *See, e.g.*, IRM 5.15.1.8(5) and (6). Accordingly, we find that it was not an abuse of discretion to disallow the claimed transportation expense.

### D. *Balancing Analysis*

Finally, at a CDP hearing the Appeals officer must consider "whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that any collection action be no more intrusive than necessary." *See* §§ 6320(c), 6330(c)(3)(C). In the Notice of Determination, AO Herring concluded that the proposed levy action balanced the need for the efficient collection of taxes with Mr. Tooke's legitimate concern about the intrusiveness of the action because Appeals "was willing to implement two different collection alternatives, such as an [OIC] or an [IA]. However, [Mr. Tooke] declined to accept either as a collection alternative." We see no abuse of discretion.

### IV. *Conclusion*

The Court will grant respondent's Motion to Dismiss and dismiss this case for lack of jurisdiction insofar as it concerns Appeals' determination regarding the proposed levy action for taxable year 2012. Further, there are no genuine disputes of material fact, and judgment may be rendered as a matter of law. Finding no abuse of discretion in any respect, we will deny Mr. Tooke's Motion for Summary Judgment and grant respondent's Motion for Summary Judgment. Accordingly, the Court will sustain Appeals' determination to uphold the filing of the NFTL and the proposed levy action to collect Mr. Tooke's unpaid income tax for the remaining taxable years at issue. We have considered all

**[\*32]** arguments made by the parties and, to the extent they are not addressed herein, we deem them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate order and decision will be entered.*